Jennifer **JEFFLEY**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 14–97–01403–CR.

Court of Appeals of Texas,
Houston (14th Dist.).

Feb. 15, 2001.

Brian D. Coyne, Houston, for appellants.

Keli Pool Roper, Houston, for appellees.

Panel consists of Justices ANDERSON, FOWLER, and EDELMAN.

## OPINION

FOWLER, Justice.

Appellant Jennifer Jeffley was certified to stand trial as an adult for the felony offense of capital murder. TEX.PEN.CODE ANN. § 19.03(a)(2) (Vernon 1994). A jury found her guilty and assessed punishment at confinement for life in the Institutional Division of the Texas Department of Criminal Justice. In seventeen points of error, appellant presents four issues for review. She claims the trial court erred in denying her motion to suppress her oral and written statements and in admitting the statements at trial because the statements were (1) the result of custodial interrogation, (2) involuntary, and (3) hearsay. She also complains that the trial court erred in not submitting the issue of voluntariness to the jury. We affirm.

### FACTS AND PROCEDURAL BACKGROUND

Appellant, a fifteen year-old eighth grader, resided at the Green Arbor Apartments. On October 29, 1996, officers from the Houston Police Department (HPD) were called to the Green Arbor Apartments to investigate the death of resident Maria Palomina. The officers found the body of Palomina just inside the door of her ground floor apartment. Further inside the apartment, the officers observed some broken ceramic pottery pieces, Palomina's eyeglasses, and blood splatters next to Palomina's body. Inside an open kitchen drawer containing cutlery knives and utensils, they found a plastic sheeting with some small blood splatters on it. The officers also observed blood smears on the wall and two purses on a table. One officer attempted to recover fingerprints and took samples of blood, hair, and fiber for analysis. Other officers took written statements from the staff and residents of the apartment complex.

Eva Mondragon, Palomina's neighbor, told police that appellant, appellant's boyfriend, Youngster, and Youngster's brother, Kenneth Driver, spent the night at her apartment. On Monday, the day of the murder, Mondragon and the two boys were awakened by screams from Palomina's apartment. They ran outside the apartment and stood on the stairs looking down into Palomina's patio. Mondragon observed Palomina's patio screen door dangling from the door frame and heard someone moaning for help. She inquired if Palomina was okay. A voice unknown to her responded, "I am okay. I just fell and hit my head." Mondragon ran to the apartment management office for help. When she returned, Driver and his brother had gone downstairs and were standing outside Palomina's apartment; they had been joined by appellant.

According to Daniel Truesdale, the apartment's maintenance man, the apartment manager sent him to Palomina's apartment because "there's possible [sic] a lady dead in an apartment." Truesdale jumped the patio fence and entered Palomina's apartment. He then opened the front door to let the manager in. She checked Palomina's pulse and called 911. Truesdale observed Mondragon and appellant come about five feet inside the apartment before the apartment manager asked them to step outside.

For her own part, appellant stated in her first written statement that she had arisen early and left Mondragon's apartment to make some phone calls at another neighbor's apartment. As she walked back to Mondragon's apartment, she saw Mondragon on the steps outside her apartment talking to Palomina. Mondragon was asking Palomina if she was OK. Appellant could not see Palomina but she heard someone say, "Yeah, I'm OK. I just fell and hit my head." Mondragon asked if Palomina wanted her to call the police and the voice answered, "No, No, No, I'm OK, I just hit my head." Appellant said that Mondragon told her the voice did not sound right and appellant agreed, so she told Mondragon to call the police. While Mondragon was gone, appellant continued to talk to the voice and attempted to enter

the apartment through the front door. She was standing in front of the steps with Mondragon when the manager and the maintenance man arrived. The maintenance man jumped over the patio fence. Appellant peered over the fence and into the open patio door. She saw the apartment manager inside the apartment and heard her inquire if Palomina was alive. At that point, appellant went over the fence, into the apartment, and up to Palomina's body. She observed the screen door on the patio floor, a broken orange flower pot, and dirt in front of Palomina's body. She saw a piece of the pot lying on Palomina's shoulder near her neck and she moved it so she could check her pulse. She became nervous because there was blood everywhere so she went back over the patio fence. When she got back, one of the young men told her that an ambulance was on its way. She walked to the front door and saw Mondragon standing at the front door so she went in. She saw the manager cover Palomina's body with a bed spread. She also saw Palomina's purse on the floor by her leg. Someone had kicked the purse so appellant picked it up and put it in a chair by the table. Then appellant went outside.

The day after the murder, Detective Roy Swainson returned to the apartment complex and spoke with appellant and her grandmother, who was visiting the family, about taking appellant to the police station for additional questioning. Appellant willingly accompanied Detective Swainson to the police station along with her boyfriend's brother. Neither appellant's mother nor grandmother accompanied her to the station.

Sergeant Waymon Allen, one of the officers who had investigated the crime scene the previous day, interviewed appellant at the police station. During the course of the interview, which was lengthy—three hours and forty-five minutes—Allen asked appellant about inconsistencies in her first statement and then about inconsistencies in the next two statements she gave that day. Each of appellant's statements of the events that she witnessed at the apartment complex conflicted with Mondragon's and Truesdale's statements. In her fourth oral statement, appellant gave information that inculpated her in the murder. Following this statement, Allen transported appellant to Judge Carol Carrier's office, where Carrier administered the required juvenile warnings to appellant. Appellant returned to the police station with Allen. Soon after she began to give a written statement to Allen, appellant's mother called to see if appellant was still there. Swainson told her that appellant was giving a modified version of her earlier statement and that they would be getting in contact with her in the next couple of hours to explain what had occurred. He did not inform her mother that appellant was confessing or offer to allow her to speak with her daughter.

When appellant completed the written statement, Allen took her to Judge Travis Lewis, who administered the second set of magistrate warnings. Appellant then signed the written statement and Allen transported her back to the police station. Around midnight, almost nine hours after she was first taken to the police station, appellant spoke with her mother by phone. Sometime between 1:00 a.m. and 3:00 a.m., Allen informed appellant's grandmother and mother that appellant was not coming home and that she was being charged with capital murder.

Appellant filed a pre-trial motion to suppress her oral and written statements, alleging violations of the her right to remain silent and right to counsel as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Texas Constitution. In addition, she asserted the statements were obtained in violation of article 38.22 of the Texas Code of Criminal Procedure and section 51 of the Texas Family Code. Appellant also alleged her statements were obtained through threats, deception, or coercion be-

cause she and her family were told that "as soon as she made the right statement she was free to leave ." After hearing testimony and argument, the trial court denied the motion and later filed findings of fact and conclusions of law. Over objection, the trial court admitted the oral and written statements into evidence at trial.

## ADMISSIBILITY OF ORAL AND WRITTEN STATEMENTS

In her first seven points of error, appellant contends the trial court erred in denying her motion to suppress her oral and written statements because they were custodial statements taken in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, Article I, section 10 of the Texas Constitution, article 38.22 of the Texas Code of Criminal Procedure, and sections 51.095 and 52.02 of the Texas Family Code. However, neither in her motion to suppress nor at the hearing on the motion did appellant complain of a violation of section 52.02 of the family code. Therefore, she waives review of this ground. *Turner v. State*, 805 S.W.2d 423, 431 (Tex.Crim.App.1991); *Davis v. State*, 22 S.W.3d 8, 11 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (holding a motion to suppress which states one legal theory cannot be used to support a different legal theory on appeal). Nevertheless, we address points of error one through five and point of error seven.

### *Standard of Review*

In a hearing on a motion to suppress evidence, the trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *State v. Ballard*, 987 S.W.2d 889, 891 (Tex.Crim.App.1999). The trial court may thus believe or disbelieve any or all of the witness's testimony. *Johnson v. State*, 871 S.W.2d 744, 748 (Tex.Crim.App.1994). As the trier of fact, the trial court may disbelieve testimony even if the testimony is uncontroverted.

See, *e.g., Mattias v. State*, 731 S.W.2d 936, 940 (Tex.Crim.App.1987); *Kirkwood v. State*, 488 S.W.2d 824, 826 (Tex.Crim.App. 1973).

In reviewing the trial court's ruling on a motion to suppress, we afford almost total deference to a trial court's determinations of historical facts that the record supports and to its rulings on the application of law to fact questions, also known as mixed questions of law, when those fact findings and rulings are based on an evaluation of credibility and demeanor. *Loserth v. State*, 963 S.W.2d 770, 772 (Tex.Crim.App.1998). In determining whether the trial court's ruling on a motion to suppress is supported by the record, we consider only the evidence adduced at the hearing on that motion. *Hardesty v. State*, 667 S.W.2d 130, 133 n. 6 (Tex.Crim.App.1984) (highlighting rule applicable in consideration of pretrial motions); *DeLeon v. State*, 985 S.W.2d 117, 119 (Tex.App.—San Antonio 1998, pet. ref'd). Mixed questions of law and fact that do not turn on an evaluation of credibility and demeanor are reviewed *de novo*. *Id.*

### *Custodial Interrogation*

In points one through five, appellant claims the trial court erred by denying her motion to suppress her written and oral statements. Appellant contends the statements were illegally taken because "she was in custody and should have [been] read her Miranda[1] and juvenile warnings." Because the issue of custody does not turn on the credibility or demeanor of witnesses in this case, we review *de novo* the trial court's legal determination that appellant was not in custody at the time she gave the statements to Allen.

"[I]ssues involving substantive rights of pre-transfer juveniles, such as legality of detention or a confession, though raised in a criminal forum," are

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

governed by the applicable provisions of the family code. *Comer v. State,* 776 S.W.2d 191, 196 (Tex.Crim.App.1989). A juvenile's confession, if illegally obtained under the applicable provisions of the family code, is inadmissible against her at a criminal trial following a transfer for criminal proceedings treating her as an adult, in accordance with the rule excluding illegally obtained evidence under article 38 .23 of the code of criminal procedure. *Comer,* 776 S.W.2d at 196; *see also* TEX.CODE CRIM. PROC. ANN. art. 38.23 (Vernon Supp.2000); *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Section 51.095 of the family code governs statements made by a juvenile. It provides for the admissibility of a child's oral or written statement under several circumstances. TEX. FAM.CODE ANN . § 51.095 (Vernon Supp.2000). The circumstances pertinent to this appeal are found in subsections 51.095(a)(1), (a)(4), and (b)(1) of the family code. Subsection 51.095(a)(1) provides that a child's written statement is admissible if the statement is made in writing while the child is in the custody of an officer, in a detention facility or other place of confinement, or in possession of the Department of Protective and Regulatory Services and at some time before making the statement,

> (1) the child received from a magistrate her statutory warnings regarding the right to remain silent, to have her attorney present during questioning, and to terminate the interview,

> (2) the child knowingly, intelligently, and voluntarily waived her rights before and during the making of the statement and signed the statement in the presence of the magistrate with no law enforcement or prosecuting attorney present, and

> (3) the magistrate signed a written statement that he is fully convinced the child understands the nature and contents of the statement and that she voluntarily waives her rights.

Subsection 51.095(a)(4) provides that a child's oral statement made while she is held under the same circumstances is admissible if, before giving the statement, the child is given her statutory warnings and the child's statement, the statutory warnings, and the child's waiver of rights are recorded by an electronic recording device. Additionally, and most importantly for our purposes here, subsection 51.095(b)(1) provides that a statement that does not stem from interrogation of the child under circumstances other than those described *supra* is admissible. Conversely, a child's written or oral statement made as a result of custodial interrogation without the benefit of a magistrate warning is inadmissible at trial. *See id.* § 51.095(a)(1), (a)(4), (b)(1); *see also* TEX. CODE CRIM. PROC. ANN. art. 38.22, §§ 2, 3 (Vernon 1979 & Supp.2000).

The record clearly indicates that appellant gave her first written statement and four oral statements to Sergeant Allen at the police station without the protections afforded a juvenile in section 51.095 of the family code. The State does not dispute that appellant made the statements while she was being interrogated. Instead, it contends that appellant was not in custody when she gave her first written statement and her four oral statements and that she had been properly warned when she gave her second written statement.

The trial court's findings of facts and conclusions of law on the denial of appellant's motion to suppress support the State's contention. The trial court found that appellant was not in custody when she made her first written statement to police on the day of the murder and she was not in custody when she made her oral statements to Allen the following day at the police station. The trial court found that at the time appellant gave her oral statements,"Sergeant Allen was making the attempt to determine what, in fact, had happened and the focus of the investigation had not centered on this defendant." The trial court further found that appellant

voluntarily waived her rights when she gave her second written statement after two magistrates fully informed her of her rights under the family code. In addition, it found no intervening factors such as duress, coercion, or promises to induce appellant to implicate herself in the murder.

In determining custody, a court examines all the circumstances surrounding the interrogation to answer the ultimate inquiry: whether there was a formal arrest or restraint of movement to the degree associated with a formal arrest. *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983); *Meek v. State*, 790 S.W.2d 618, 621 (Tex.Crim.App. 1990). In Texas, the standard applied to adults in determining whether an individual is in custody is well-established. A person is in custody only if, under the circumstances, a reasonable person would believe her freedom of movement was restrained to the degree associated with a formal arrest. *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex.Crim.App.1996) (citing *Stansbury v. California*, 511 U.S. 318, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994)). The reasonable person standard presupposes an innocent person. *Dowthitt*, 931 S.W.2d at 254.

■ The standard applied to juveniles is not so well defined. The Austin Court of Appeals, in *In re L.M.*, 993 S.W.2d 276 (Tex. App.—Austin 1999, pet. denied), recently announced a standard applicable to juveniles. After reviewing the constitutional procedural rights that the United States Supreme Court has extended to juveniles and the standards applied by sister states to determine custody, the Austin Court of Appeals concluded that it is "appropriate for Texas courts to consider the age of the juvenile in determining whether the juvenile was in custody." *Id.* at 289. We agree with the reasoning of our sister court and adopt the standard utilized in *In re L.M.*: whether, based upon the objective circumstances, a reasonable child of the same age would believe her freedom of movement was significantly restricted. *Id.* at 289.

■ Under either standard, the determination of custody is based entirely upon objective circumstances. *Dowthitt*, 931 S.W.2d at 254–55. Factors relevant to a determination of custody include (1) probable cause to arrest; (2) focus of the investigation; (3) subjective intent of the police; and (4) subjective belief of the defendant. *Id.* 254. The subjective intent of law enforcement officials to arrest is irrelevant unless that intent is somehow communicated or otherwise manifested to the suspect. *Id.; Stansbury*, 114 S.Ct at 1530.

■ Station house questioning does not, in and of itself, constitute custody. *Dowthitt*, 931 S.W.2d at 255. The following situations generally constitute custody: (1) when the suspect is physically deprived of her freedom of action in any significant way; (2) when a law enforcement officer tells the suspect she cannot leave; (3) when a law enforcement officer creates a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted; and (4) when there is probable cause to arrest and a law enforcement officer does not tell the suspect that she is free to leave. *Id.* (citing *Shiflet v. State*, 732 S.W.2d 622, 629 (Tex.Crim.App.1985)). In the first through third situations, the restriction upon freedom of movement must amount to the degree associated with an arrest and not merely an investigative detention. *Dowthitt*, 931 S.W.2d at 255. In the fourth situation, the officer's knowledge of probable cause must be manifested to the suspect. *Id.* "Such manifestation could occur if information substantiating probable cause is related by the officers to the suspect or by the suspect to the officers." *Id.* Custody is established under the fourth situation if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that she is under restraint to the degree associated with an arrest. *Id.*

The record reflects that appellant was not in custody the day she gave her first written statement and when she gave her first oral statement the following day at the police station. A person is not in custody if she acts upon the invitation or request of the police and there are no threats, express or implied, that she will be forcibly taken. *Chambers v. State,* 866 S.W.2d 9, 19 (Tex.Crim.App.1993). Yet, at some point after she arrived at the station and questioning began, the consensual non-custodial questioning escalated into custodial interrogation. *See Dowthitt,* 931 S.W.2d at 255 (noting "the mere fact that an interrogation begins as non-custodial does not prevent custody from arising later; police conduct during the encounter may cause a consensual inquiry to escalate into custodial interrogation").

Sergeant Allen, who interrogated appellant at the police station, testified at the suppression hearing that he did not consider appellant to be a suspect in Palomina's murder even though he believed she lied in the written statement that she gave police the day before. To some extent, he considered all the witnesses who were standing outside Palomina's apartment to be suspects. His purpose in questioning appellant was to determine just exactly what happened and to fill in the gaps in the sequence of events. He specifically wanted to question appellant about discrepancies in her first written statement and the statements of Mondragon and Truesdale,[2] and he conveyed this agenda to appellant. Allen did not inform appellant before questioning that she had a right to a lawyer or that she could leave at any time. He told her that after they had taken statements from all of the witnesses, the officers would arrange for everyone to go home.

According to Allen, appellant agreed to discuss her first written statement and indicated it was a truthful statement. In her first oral statement, appellant recount-ed the same version of events that she had given in her first written statement. Allen told appellant that her written statement and her oral account were in direct contradiction to Mondragon's and Truesdale's statements. Allen said that Mondragon's statement also indicated that appellant asked Mondragon to lie about her whereabouts. Allen felt that "[t]here were definitely some concerns why that had happened and why she wanted to be present at that point." When confronted with the conflicting statements, appellant admitted her statements were not true and changed her story.

In her second oral statement, appellant said that when Mondragon returned from the manager's office, she told appellant to go over the fence, into the apartment, and to check on Palomina before Truesdale arrived on the scene. Mondragon, Truesdale, and the apartment manager joined appellant in the apartment soon thereafter. Appellant described the apartment and claimed that she moved a piece of broken pottery that was on Palomina's neck. She picked up Palomina's purse and put it in a chair at Mondragon's direction. Appellant was ordered out of the apartment when appellant told the apartment manager to cover Palomina's body.

Allen then asked if appellant had ever been in Palomina's kitchen. Allen said that "there was a kitchen drawer that was open in the kitchen and it was, based on the other physical evidence there, blood in that drawer and a knife jammed into the facing of the cabinet that I believe that it was possible that the murder weapon may have came [sic] from that drawer." Appellant further attested that she had forgotten to tell them about going into the kitchen and said that she went into the kitchen to retrieve a pen so that she could start writing down what she saw and did for the police because Mondragon told her the police were going to ask her those things.

---

**2.** Neither Mondragon's nor Truesdale's written statements are in the record before this court.

Allen testified that "the statement just didn't make any sense at that time and I told her that I could determine that she wasn't being honest, that it just didn't make any sense, that the sequence didn't make any sense as she had described it." Once again, appellant confessed an untruth and promised a new version. After washing her face in the restroom, appellant gave Allen a third statement.

In the third statement, appellant told Allen that Mondragon talked about roughing up Palomina because Palomina had complained about the noise in Mondragon's apartment. Appellant said upon returning to Mondragon's apartment after making some phone calls, she saw Mondragon and a person named Frank coming over the patio fence. Appellant admitted the statement wasn't true and confessed she said it because Mondragon told the police that appellant asked Mondragon to lie. Allen asked her if she was trying to get attention, if she was afraid to tell the truth, if she was protecting someone or just concerned that someone would come back and harm her and her family. Appellant said she was afraid that someone would hurt her family and like before, she promised to tell the truth.

According to Allen, appellant confessed to her involvement in the murder in her fourth oral statement, as follows: Appellant and two men, Ernest and Tim, planned to steal Palomina's car. Because they could get a better price for the car if the car was intact instead of damaged from a break-in, the men decided to rob Palomina, tie her up, and retrieve the keys to the car. Appellant agreed to be a lookout in exchange for a share in the proceeds from the sale of the car to a "chop shop." Appellant thought the robbery would take place on Monday night, but the two men did not show up. On Tuesday morning, she ran into the two men on her way back to Mondragon's apartment and they decided to rob Palomina.

Appellant and the two men scaled Palomina's patio fence and entered Palomina's apartment. Palomina approached them, screaming, and Ernest hit her in the head with a clay pot. Appellant and Tim searched the apartment for the car keys. Appellant looked for the car keys in a purse on the kitchen table and in a purse in Palomina's bedroom. She found some keys sporting a Honda medallion in the purse in the bedroom and she gave them to Tim. Ernest continued to assault Palomina and Palomina continued to scream. Appellant was concerned that Palomina could identify her. Appellant and Tim went into the kitchen, and, following Tim's directive, she retrieved a knife from a kitchen drawer. Tim grabbed the knife and gave it to Ernest, and Ernest stabbed Palomina. Appellant was inside Palomina's apartment when Mondragon came down the stairs and inquired if Palomina was okay.

Following this oral confession, Allen arranged to take appellant to Judge Carrier to administer the juvenile magistrate warnings. At this point, Allen testified, he considered appellant to be a suspect in custody.

 The objective circumstances of appellant's encounter with Sergeant Allen, however, indicate that she was in custody at some point after Allen began to press her for a truthful statement. From 2:45 p.m. until 6:00 p.m., the fifteen year-old eighth-grader sat alone, without a parent or lawyer present or accessible, in a police station with a police officer, who had been one of the crime scene investigators. The officer never informed her that she was free to leave, never informed her of any of her rights under the Texas Family Code, and never made arrangements for her to return home, as promised. Instead, the officer, who believed she had lied in her first statement, confronted appellant for three hours about discrepancies in her statements until she gave a statement inculpating herself in the murder. Considering the naturally coercive nature of a police station, the authority entrusted a police officer, and the nature of Allen's

interrogation, a reasonable fifteen year old would believe her freedom of movement had been significantly restricted to the extent associated with a formal arrest soon after she gave her second oral statement.[3] Because the record does not support the trial court's conclusion that appellant's third and fourth oral statements were not the result of custodial interrogation, the trial court erred in holding otherwise.

■ Appellant's second written statement was also the result of custodial interrogation, but it was obtained in accordance with section 51.095 of the family code.[4] Therefore, the trial court did not err in denying appellant's motion to suppress the statement.

■ Appellant's third and fourth oral custodial statements, however, were obtained without a magistrate's warning and were not electronically recorded in violation of section 51.095 of the family code. Therefore, the statements were inadmissible under article 38.23 of the code of criminal procedure.[5] Accordingly, the trial court erred in refusing to suppress these oral statements.

■ Having determined that the trial court erred in this regard, we must now examine whether the error constitutes reversible error. Under Rule 44.2 of the Texas Rules of Appellate Procedure, the nature of the error controls the standard under which it will be evaluated. *Easley*

*v. State*, 986 S.W.2d 264, 267 (Tex.App.— San Antonio 1998, no pet.). Constitutional error requires reversal of the judgment or punishment unless the reviewing court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment. Tex.R.App. P. 44.2(a). Any other error, defect, irregularity, or variance not affecting substantial rights must be disregarded. Tex.R.App. P. 44.2(b).

■ Because the improper admission of a statement in response to custodial interrogation implicates the constitutional right against self-incrimination, the trial court's error in this case was constitutional error.[6] *Easley*, 986 S.W.2d at 267. Accordingly, we will reverse unless the record establishes beyond a reasonable doubt that the admission of the two oral statements did not contribute to appellant's conviction. Tex.R.App. P. 44.2(a).

■ In applying this standard of review we do not focus on the propriety of the outcome of the trial. *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex.Crim.App. 2000), *petition for cert. filed*, —— U.S.L.W. —— (U.S. December 15, 2000) (No. 00–7587). Instead, we focus on the error and its possible impact in light of the existence of other evidence. *Id.; Harris v. State*, 790 S.W.2d 568, 586–88 (Tex.Crim.App. 1989). "[A] reviewing court asks if there was a reasonable possibility that the error, either alone or in context, moved the jury

---

3. Allen's testimony reflects that appellant's second oral statement placed her inside Palomina's apartment, which prompted Allen to ask her if she had been in the kitchen where he found blood splatters. At that point, Allen knew appellant was not being honest and told her so.

4. Judge Carol Carrier fully cautioned appellant about her rights before appellant gave her six-page statement. Upon completion of the statement, Judge Travis Lewis administered the same statutory warnings and made a determination that appellant understood the warnings and gave the statement voluntarily.

5. Evidence that a law enforcement officer obtains in violation of any provision of the Con-

stitution or laws of the United States of America or of the Constitution or laws of the State of Texas is inadmissible in evidence against the accused on the trial of any criminal case. Tex.Code Crim. Proc. Ann. art. 38.23(a) (Vernon Supp.2000). The terms of article 38.23 are mandatory; a judge has no discretion in ruling on the exclusion of evidence if the evidence was obtained in violation of state statute or constitutional provision. *Polk v. State*, 738 S.W.2d 274, 276 (Tex.Crim.App.1987).

6. Article 38.22 of the code of criminal procedure codifies *Miranda's* system of protecting a suspect against self-incrimination. Tex.Code Crim. Proc. Ann art. 38.22 (Vernon 1979 & Supp.2000).

from a state of nonpersuasion to one of persuasion as to the issue in question." *Wesbrook*, 29 S.W.3d at 119.

■ To perform a harmless error analysis an appellate court should consider the following factors: 1) the source of the error; 2) the nature of the error; 3) whether the error was emphasized and its probable collateral implications; 4) the weight a juror would probably place upon the error; and 5) whether declaring the error harmless encouraged the State to repeat it with impunity. *Wilson v. State*, 938 S.W.2d 57, 61 (Tex.Crim.App.1996). Though no one factor is dispositive, the existence and severity of these factors are indicative of the harm caused by the admission of the oral statements. *Id.* Having identified the source and nature of the error, we now consider the remaining factors.

At trial, Sergeant Allen testified to appellant's first three oral statements, none of which inculpated appellant in the murder. If anything, the statements reflected her credibility, or lack thereof. The prosecutor recounted each statement in closing arguments and argued that appellant's lying was evidence of her guilt.

Allen also testified to part of her fourth oral statement, as follows in pertinent part:

She told me that two days prior to this homicide that some friends had came [sic] over to the complex and that there had been a conversation between her and these other two young men concerning taking Ms. Palomina, the complainant's vehicle, that one of these men, a guy named Ernest who she referred to as E and also as Ernest Swatson, had commented about how clean the car was and that he wanted to take it.

There was discussion about, well, why don't you just steal the car. And the discussion led to the fact that if they smashed the window out and broke the ignition to steal it that they would get less money.

And I say they, she is telling me that Ernest was talking about saying they would get less money for the vehicle if it was damaged and that they needed the keys.

The other person that she said was present was an individual she referred to as a street name, if you will, of Slow or Tim. She didn't know this man's last name. And that they had asked her to participate as being a lookout. They had asked her if she would be down with it and that they would kick it down to her, meaning that she would get some money from the sale of the vehicle.

She told me that she thought they was going to steal the car at night. This first conversation that she was referring to was Sunday night. Again, it was two days before and so she believed that the—they were going to do this, take the car Monday, and that Monday came and went and she didn't hear from them, didn't see them. It didn't happen.

Then she described the events of Tuesday morning again starting with getting up and what she had done.

Although this portion of the fourth oral statement did not inculpate appellant in the murder, it provided the reason for appellant's presence in Palomina's apartment. The State argued in its closing statement that this statement indicates that appellant was not a misinformed child when she signed her second written statement. According to the State, appellant's fourth oral statement reflects the following:

This poor little child is someone who by virtue of her own statement tells you she had no qualms thinking about acting as a lookout, going into somebody's apartment while she's there, tying the lady up and just stealing her keys. No problem at all. That doesn't sound like a child to me.

■ From Allen's testimony about appellant's oral statements, the jury could easily have perceived appellant as conniving and untruthful, willing to lie to protect

her own self-interest. Yet, in light of appellant's second written statement and other testimony, the jury probably did not place a great deal of weight on the oral statements as evidence of appellant's guilt. Given the strict requirements upon law enforcement officers in the family code regarding interrogation of juveniles, it is unlikely that declaring the admission of the oral statements harmless would encourage the State to repeat the error with impunity. Accordingly, we find the record establishes beyond a reasonable doubt that the admission of appellant's third and fourth oral statements did not contribute to her conviction.

Appellant's first five points of error are overruled.

### Voluntariness of Statements

In her seventh point of error, appellant contends the trial court erred in denying her motion to suppress the oral and written statements under the Due Process Clause of the Fourteenth Amendment because they were involuntary. Appellant claims the police tricked her into confessing her involvement in the crime. Appellant further claims because she was a suspect when taken to the police station the second time, she should have been taken before a magistrate and given the statutory warnings before interrogation and her mother should have been notified of her whereabouts and when to expect her home. She argues that the police's failure to follow these procedures invalidates her oral and written statements.

■ Because the issue of voluntariness of a statement turns on the evaluation of credibility of the witnesses, we apply a deferential standard in our review of appellant's voluntariness claim in her motion to suppress. *Garcia v. State*, 15 S.W.3d 533, 535 (Tex.Crim.App.2000).

■ A statement is involuntary if the record reflects "official, coercive conduct of such a nature that any statement obtained thereby was unlikely to have

been the product of an essential free and unconstrained choice by its maker." *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex. Crim.App.1995). "Trickery or deception does not make a statement involuntary unless the method was calculated to produce an untruthful confession or was offensive to due process." *Creager v. State*, 952 S.W.2d 852, 856 (Tex.Crim.App.1997). In determining the propriety of police conduct, the court considers police knowledge of a suspect's special weakness, such as youth. *Gallegos v. Colorado*, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962); *Gomes v. State*, 9 S.W.3d 373, 377 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd). The voluntariness of a confession, apart from the prophylactic rules imposed by *Miranda*, is determined by the totality of the circumstances. *Gallegos*, 82 S.Ct. at 1211; *Darden v. State*, 629 S.W.2d 46, 51 (Tex.Crim.App.1982).

The trial court made no explicit finding that appellant voluntarily gave her four oral statements. In its Findings of Fact and Conclusions of Law, the trial court found "no intervening factors such as duress, coercion, either emotional or physical, nor ... any promises made in any way to induce this defendant to make the confession implicating herself in the capital murder."

■ The record reflects no evidence that officers employed trickery or deception to procure a confession from appellant. Instead, the record indicates that appellant freely gave several versions of the events she witnessed on the day of the murder in response to a police officer's probing challenges to her credibility. The trial court did not abuse its discretion in denying appellant's motion to suppress on the ground that her oral statements were involuntary.

The record is also void of evidence that appellant was not properly admonished both before and after giving her second written statement. The record indicates that Judges Carrier and Lewis fully ad-

monished appellant of her rights, questioned her about understanding of these rights, and her decision to waive them. Both judges testified that appellant understood her rights and voluntarily gave her second written statement.

Of concern, however, is whether the police's failure to notify appellant's mother when the non-custodial interrogation became custodial rendered her second written statement involuntary. Appellant, however, did not preserve this claim for appeal because she did not object in her motion to suppress or at the hearing on the motion that the State's failure to notify her mother rendered her statements involuntary. Because her complaint on appeal does not comport with her objections below, she waives review. *Turner*, 805 S.W.2d at 431; *Davis*, 22 S.W.3d at 11. Accordingly, we overrule appellant's seventh point of error.

### Admission of Oral Statements At Trial

In points of error nine through fourteen, appellant complains of the admission of the oral statements at trial because the statements were the result of custodial interrogation and therefore, inadmissible. Appellant also claims the statements were inadmissible because they are hearsay and not subject to the exception offered by the State at trial. Appellant also raises the hearsay claim in her seventeenth point of error.

We do not reach appellant's first argument because, in points one through four, we found the admission of appellant's oral statements was harmless error. Appellant's second argument is also without merit because none of the statements are hearsay.

 "Hearsay" is a statement, other than one made by the declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted. Tex.R. Evid. 801(d). In her first three oral statements, appellant recounted her observations of the events surrounding the murder of Palomina. None of the statements implicated her; none were offered to prove the truth of the matter appellant asserted. Because the statements were not hearsay, they were admissible at trial. Tex.R. Evid. 802.

Arguably, the State offered appellant's fourth oral statement to prove the truth of the matter asserted. The trial court admitted Allen's testimony over appellant's running objections on the ground offered by the State that the statement was "certainly furtherance of what could be conceived as a cover-up, that is the continuing of the conspiracy." Appellant contends the statement is not a statement in furtherance of a conspiracy but hearsay.

 A statement is not hearsay if it is an admission by a party opponent. Tex.R. Evid. 801(e)(2). A statement by a co-conspirator of a party during the course and in furtherance of a conspiracy is an admission by a party opponent. Tex.R. Evid. 801(e)(2)(E). To avail itself of the co-conspirator rule, the State must demonstrate that (1) a conspiracy existed; (2) the statement was made during the course of and in furtherance of the conspiracy; and (3) both the declarant and appellant were members of the conspiracy. *Deeb v. State*, 815 S.W.2d 692, 697 (Tex.Crim.App.1991); *Crum v. State*, 946 S.W.2d 349, 363 (Tex. App.—Houston [14 Dist.] 1997, pet. ref'd). Obviously, Sergeant Allen, the declarant, was not a member of the conspiracy and the State offered no proof that a conspiracy existed. Therefore, appellant's fourth oral statement was not a statement in furtherance of a conspiracy.

 Appellant's fourth statement, however, is an admission by a party opponent. A statement qualifies as an admission by party opponent if it is offered against a party and it is the party's own statement. Tex.R. Evid. 801(e)(2)(A). To qualify as an admission by a party opponent, the witness testifying to the party admission must have firsthand knowledge of the party's admission; otherwise any testimony regarding the admission is hearsay. *Hughes v. State*, 4 S.W.3d 1, 6 (Tex.Crim.App. 1999). In this case, appellant gave her fourth statement to Sergeant Allen, who

testified to the same at trial. Because an admission by a party opponent is not hearsay, the trial court did not err in overruling appellant's objection and admitting the statement into evidence at trial.

Accordingly, we overrule appellant's ninth through fourteenth points of error and her seventeenth point of error.

In her fifteenth point of error, appellant contends her oral and written statements were illegally obtained because she was not detained in an office that was a designated juvenile processing office as required by section 52.025(a) of the family code. Appellant, however, did not preserve this claim on appeal because she did not complain of any violations of section 52.025 of the family code in her motion to suppress or at the hearing on the motion. Because her complaint on appeal does not comport with her contentions below, she waives review. *Turner,* 805 S.W.2d at 431; *Davis,* 22 S.W.3d at 11. Accordingly, appellant's fifteenth point of error is overruled.

### SUBMISSION OF VOLUNTARINESS ISSUE TO JURY

■ In her eighth point of error, appellant contends the trial court erred in not submitting her requested charge on the voluntariness of the confession to the jury. When the issue of voluntariness of a confession is raised by the evidence, the trial judge shall appropriately instruct the jury, generally, on the law pertaining to such statement. TEX.CODE CRIM. PROC. ANN. art. 38.22, § 7 (Vernon 1979). However, before the requested instruction is required, some evidence must be presented to the jury which raises the issue of voluntariness. *Butler v. State,* 872 S.W.2d 227, 236 (Tex.Crim.App.1994).

■ Appellant contends the testimony of her mother and grandmother that the police did not notify them when they took appellant into custody raised a fact issue concerning the voluntariness of appellant's oral and written statements. Section 52.02(b) of the family code requires a police officer to promptly notify the child's parent and the official designated by the juvenile court that he has taken the child into custody and to inform the same parties of the reason for seizure. TEX. FAM. CODE ANN. § 52.02(b) (Vernon Supp.2000). Failure to comply with section 52.02(b) renders a subsequent confession inadmissible. *See Gonzales v. State,* 9 S.W.3d 267, 270–71 (Tex.App.—Houston [1st Dist.] 1999, pet. granted); *In re C.R.,* 995 S.W.2d 778, 785–85 (Tex.App.—Austin 1999, pet. denied).

■ Appellant's requested instruction, however, did not instruct the jury to consider the voluntariness of her statements in light of the section 52.02(b) requirement to notify a parent. Instead, appellant's requested instruction addressed the provisions of section 51.095 of the family code that govern the admission of a juvenile's written and oral statements. Because appellant's trial objection does not comport with her argument on appeal, any error is waived. *Penry v. State,* 903 S.W.2d 715, 753 (Tex.Crim.App.1995). Appellant's eighth point of error is overruled.

Finding no reversible error, we affirm the judgment of the court below.