Kevin SAUCEDA, Appellant,

v.

The STATE of Texas, Appellee.

No. 14–01–00408–CR.

Court of Appeals of Texas,
Houston (14th Dist.).

Feb. 3, 2005.

Shawna L. Reagin, Houston, for appellant.

Carmen Castillo Mitchell, Houston, for appellee.

Panel consists of Justices YATES, EDELMAN, and GUZMAN.

## OPINION ON REMAND

EVA M. GUZMAN, Justice.

In 2001, appellant Kevin Sauceda was convicted of aggravated sexual assault of a child and sentenced to forty years' confinement. This court affirmed the conviction in an unpublished opinion, holding that (1) the complainant's outcry statement was sufficiently reliable; (2) appellant's constitutional right of confrontation had not been violated; and (3) the State was entitled to introduce a videotape of the complainant's interview with a caseworker, in its entirety, under the rule of optional completeness if the defense called the caseworker to testify. *Sauceda v. State*, No. 14–01–00408–CR, 2002 WL 977152, at *1 (Tex.App.-Houston [14th Dist.], Feb. 28, 2002) ("*Sauceda I*"). The Court of Criminal Appeals granted review to determine whether asking a question for impeachment purposes rendered the "entire videotaped interview of extraneous offenses admissible under the rule of optional completeness." *Sauceda v. State*, 129 S.W.3d 116, 117 (Tex.Crim.App.2004) ("*Sauceda II*"). In a divided opinion, the Court of Criminal Appeals concluded that the videotape would not have been admissible and remanded the case to this court with instructions to conduct a harm analysis. *Id.* at 124. For the reasons discussed below, we hold that the error was harmless and affirm appellant's conviction.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The facts of this case are thoroughly set forth in *Sauceda II* and we need not detail

them here. *See id.* at 117–19. However, to place our harm analysis in context, we briefly summarize the pertinent factual and procedural history of this case.

At the time of the charged offense, appellant was unable to walk without the aid of a walker or a wheelchair and required assistance with some basic functions.[1] He was living with his mother and three nieces, C.S., M.S., and B.S. After a family reunion, appellant's sisters became suspicious that appellant may have molested the three girls and they questioned their nieces. The circumstances surrounding the questioning were described in *Sauceda I* as follows:

> Appellant's family stayed at a local motel. Appellant's sisters ... Valicia Evans, Margo Suggs, and LaNelle Sauceda, as well as their cousin, Janette LaStrape, became alarmed when appellant asked both C.S. and B.S. to sleep in his room.... That evening, the aunts questioned C.S. and M.S. separately. Both denied having been molested. The following day, the aunts spoke with the girls again. They spoke first with the youngest, B.S., who said she had been molested. According to Ms. Evans'[s] written recitation of the girls' outcry, B.S. also said M.S. and C.S. had been molested. The aunts then called C.S. into the room. According to Ms. Evans's narrative, the following transpired:
>
> > We told her that she needed to tell us everything because her sister, [B.S.], has told us how [appellant] has done some things to her and her sisters and she replied why would you say a thing like that. So we told [B.S.] to tell her its [sic] OK, to tell the truth, and we

won't be mad at her and that it is always better to tell the truth. It was hard at first, but she finally told us that he did ... We then called [M.S., who admitted the molestation].

*Sauceda,* 2002 WL 977152, at *1 (some alterations in original). Although the State charged appellant with three counts of sexual assault, one for each niece, he was prosecuted only for the offense against M.S. *Id.*

At trial, M.S. testified to two incidents of sexual assault by appellant, both occurring during the summer of 1999. M.S. stated that during the first incident, appellant called her into his room and told her to take off her clothes. When she refused, he threatened her with a butcher knife. She then complied and appellant sexually assaulted her, penetrating her vagina with his penis. M.S. testified that during the second incident, which occurred approximately one week before the family reunion, appellant again called her into his room and told her to get into bed with him. When she refused, he pulled a gun out from under the covers. She again complied and appellant sexually assaulted her.

On cross-examination, appellant's counsel questioned M.S. regarding any statements she had made to anyone about appellant's use of the butcher knife or the gun prior to trial, including whether the information was contained in her videotaped interview with Children's Protective Services Investigator Fiona Stephenson.[2] M.S. testified that she could not remember whether she had mentioned the knife or the gun to her aunts and the police. Although initially M.S. stated that she thought she had mentioned it during the

---

1. Although in *Sauceda II* it was stated that appellant was "confined to a wheelchair" at the time of the offense, the record indicates he used a wheelchair, but was also ambulatory with the aid of a walker.

2. This questioning of M.S. covered approximately fifteen pages of the reporter's record.

videotaped interview, when appellant's counsel asked M.S., "if we look at the videotape will we see you talking about a butcher knife?," M.S. replied that she could not recall.

After the State rested, appellant's counsel indicated he wished to call Stephenson as an impeachment witness, claiming that M.S. made no mention of the knife or gun during the videotaped interview. Appellant informed the court that the State had indicated it would object to Stephenson's testimony and would move to introduce the entire videotape under the rule of optional completeness if the defense attempted to impeach M.S.'s testimony through Stephenson.[3] The trial court stated it agreed with the State and, at that point, appellant's counsel made an offer of proof, stating that if he had called Stephenson she would testify that M.S. never referred to the use of a gun or a knife during the videotaped interview and that Stephenson would also state she never "specifically asked [M.S.] about the presence of a weapon or the use of one as a threat." The defense subsequently rested without calling any witnesses.

As noted, appellant's direct appeal asserted, in part, that the trial court erred in ruling the videotape would be admissible under the rule of optional completeness if Stephenson were allowed to testify. We affirmed the trial court's ruling, and the Court of Criminal Appeals determined we erred. *Sauceda*, 129 S.W.3d at 124. In accordance with that court's mandate, we now address whether the trial court's error was harmful.

## II. HARM ANALYSIS

### A. Harmless Error Standard

The harmless error standard we apply in this case depends on whether the trial court's erroneous exclusion of Stephenson's testimony—the "sole defense witness"—amounted to a violation of appellant's constitutional right to present a defense. *Sauceda*, 129 S.W.3d at 121; *Potier v. State*, 68 S.W.3d 657, 665 (Tex.Crim. App.2002); *see Ray v. State*, 148 S.W.3d 218, 225–26 (Tex.App.-Texarkana 2004, no pet.) (examining whether the defendant was allowed to present a defense). An erroneous evidentiary ruling may—although rarely does—rise to the level of denying a defendant the constitutional right to present a meaningful defense. *Potier*, 68 S.W.3d at 663. Exclusion of a defendant's evidence is constitutional error only if "the evidence forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense." *Id.* at 665.

In his brief, appellant argued that he was "greatly harmed" by the exclusion of Stephenson's testimony because he was unable to "establish that [M.S.] had misrepresented a highly prejudicial aspect of her alleged assault, especially since this went to the heart of his defensive theory that the child's allegations were due to her susceptibility to suggestion and penchant for embroidering upon her previous statements." According to appellant, Stephenson's testimony would have established that M.S. had not told anyone about a gun or knife prior to trial and that portion of her testimony was but a "confabulation."

For the reasons discussed below, we conclude that despite appellant's inability to present Stephenson's testimony, he was able to impeach M.S.'s testimony concerning the weapons through his questioning of M.S. and other witnesses. *Cf. Potier*, 68 S.W.3d at 665–66 (listing among the evi-

---

**3.** According to appellant's counsel, the videotaped interview with M.S. contained numerous references to appellant's alleged sexual assaults of M.S.'s sisters, C.S. and B.S.

dence establishing defendant's defense, testimony of a police officer that supported the defendant's claim of self-defense); *see also Sanchez v. State,* No. 13–99–591–CR, 2004 WL 1584923, at * 3–4 (Tex.App.-Corpus Christi, July 15, 2004, pet. ref'd) (not designated for publication) (relying in part on counsel's cross-examination of witnesses to conclude the defendant was not precluded from presenting his defense).

As to the issue of whether M.S. told anyone before trial that appellant had threatened her with a knife and a gun, appellant's counsel cross-examined M.S. as follows:

> Q.: Now, the day it happened you never said anything to your Aunt Jackie about [appellant] having a butcher knife; did you?
>
> M.S.: No.
>
> \* \* \* \*
>
> Q.: And that day you didn't say anything to your grandmother about [appellant] having a butcher knife; did you?
>
> \* \* \* \*
>
> M.S.: Oh, no, no, sir.
>
> \* \* \* \*
>
> Q.: But you didn't tell your aunts about a butcher knife; did you?
>
> M.S.: I don't think I did. I think—I don't remember.
>
> \* \* \* \*
>
> Q.: Do you remember after you talked to your aunts you talked to some people from the police department; do you remember that?
>
> M.S.: Yes.
>
> Q.: You didn't tell them about a butcher knife did you?
>
> M.S.: I don't remember.

Counsel continued this line of questioning, specifically asking M.S. whether she told Stephenson during the taped inter-

view about the butcher knife. Initially M.S. stated she did not remember whether she had, but then stated, "I think I did." Following some additional questions, which evidenced M.S.'s uncertainty as to whether she had in fact told Stephenson about the knife, appellant's counsel questioned M.S. further, as follows:

> Q.: If we look at that videotape will we see you talking about a butcher knife?
>
> M.S.: I don't remember. I don't know.
>
> \* \* \* \*
>
> Q.: But that was closer to the third grade than it is now—the time you made the videotape was closer to third grade than today is to the third grade; right?
>
> M.S.: Yes.
>
> Q.: Things were fresher in your mind; correct?
>
> M.S.: Yes.
>
> Q.: You remember things a little better then; right?
>
> M.S.: Yes, a little.
>
> Q.: So what you said on the videotape is different than what you're saying today. What you said on the videotape is probably more true than what you're saying today; correct?
>
> M.S.: No.
>
> Q.: What's on the videotape is not more true?
>
> M.S.: Yes, it's true. And everything I'm saying today, I am saying today is true.
>
> Q.: So on the videotape if you don't talk about a butcher knife that would be true, there was no butcher knife?
>
> M.S.: It is [sic] a butcher knife.
>
> Q.: Can you tell me today any reason that when you were making the video-

tape that you would have left the butcher knife out of your story?

M.S.: I don't know.[4]

Appellant's counsel then asked M.S. if, prior to the reunion, she had mentioned to any of a number of individuals that appellant had threatened her with a butcher knife and a gun. These individuals were three of M.S.'s aunts present during her outcry statement, her Aunt Jackie, her two summer school teachers, her grandmother, and her mother. In response, as to each individual mentioned, M.S. stated that she had not told them.[5] M.S. also acknowledged that after she made the videotape, she had not told anyone about the butcher knife or the gun.

The State's outcry witness, Valicia Evans, one of M.S.'s aunts attending the reunion, did not mention appellant's use of a weapon during her direct examination when recounting what M.S. had told her about the assaults. On cross-examination of Evans, appellant's counsel impugned the credibility of M.S.'s testimony regarding the weapons by questioning Evans as follows:

> Q.: Did you try to tell the police everything important that you knew?
>
> A.: Yes.
>
> Q.: Did you tell the police that [M.S.] had told you that [appellant] threaten [sic] her with a gun?
>
> A.: No.
>
> Q.: Can you think of anything as you sit here now important that . . . you

didn't tell the police about a gun or weapon or anything about a weapon that you did not tell to the police?

> A.: I did to the best of my ability. No.

Appellant's counsel also challenged M.S.'s testimony concerning the weapons through his questioning of Sharon Ballard, the detective investigating the assaults against M.S. Indeed, after establishing that Ballard watched as the videotaped interview was conducted, through closed-circuit television, counsel's questioning of Ballard demonstrated that M.S. had not mentioned appellant had threatened her with a knife or a gun, as follows:

> Q.: So if a child said to you, based on your training and experience, there's an adult in my neighborhood and he has a big butcher knife that he threatens children with, and he has a gun that he threatens children with, would that be the kind of information where you would wait 13 days[6] to do something about it?
>
> A.: No sir. I'd call homicide.
>
> * * * *
>
> Q.: Based on your investigation, did you ever have any reason to be searching for a butcher knife?
>
> A.: No, sir.
>
> Q.: Based on your investigation, did you have any reason to be searching for a gun?
>
> A.: No, sir.

---

4. At that point in the proceedings, M.S. began crying and the court adjourned for a short recess.

5. Following this, appellant's counsel asked M.S. who was the first person she "ever told about the butcher knife and the gun." M.S. stated that she told her Aunt Val and Aunt "Nel" after they had asked her the second time. At that point, M.S. also stated that she had told the police, but she stated she did not

know if she had talked about the weapons during the videotaped interview with Stephenson.

6. Detective Ballard had previously testified that the taped interview occurred on July 7, 1999, but she had not requested a warrant for appellant's arrest until July 20, 1999, a delay of thirteen days.

Q.: And again, based—you're an instructor. You're an expert. If you thought someone was out threatening children with guns and butcher knives, would that be a priority case for you?

\* \* \* \*

A.: Yes, sir.

Based on this testimony, we conclude appellant was able to impeach M.S.'s testimony regarding the knife and gun; therefore, he was not precluded from presenting his defense by the exclusion of Stephenson's testimony and, accordingly, we apply the harmless error standard of Rule of Appellate Procedure 44.2(b).

**B. Rule of Appellate Procedure 44.2(b)**

■ Under Rule of Appellate Procedure 44.2(b), a non-constitutional error not affecting a defendant's substantial rights must be disregarded. Tex.R.App. P. 44.2(b); *Jeffley v. State*, 38 S.W.3d 847, 858 (Tex.App.-Houston [14th Dist.] 2001, pet. ref'd). A substantial right is affected if: "(1) the error had a 'substantial and injurious' effect or influence in determining the jury's verdict or (2) leaves one in grave doubt whether it had such an effect." *Davis v. State*, 22 S.W.3d 8, 12 (Tex.App.-Houston [14th Dist.] 2000, no pet.). In conducting our analysis, we are to consider the entire record, including all evidence admitted, the nature of the evidence in favor of the verdict, and "the character of the alleged error and how it might be considered in connection with other evidence in the case." *Arroyo v. State*, 123 S.W.3d 517, 520 (Tex.App.-San Antonio 2003, pet. ref'd) (citing *Motilla v. State*, 78 S.W.3d 352, 355 (Tex.Crim.App.2002)). We may also consider other factors, such as the jury instructions, theories of the parties, closing arguments, voir dire, and whether the State emphasized the error. *Motilla*, 78 S.W.3d at 355–56.

**C. Discussion**

■ The testimony presented above not only establishes appellant was not precluded from presenting his defense by the exclusion of Stephenson's testimony, but also evidences that appellant's substantial rights were not affected by the trial court's evidentiary ruling. *See, e.g., Ray*, 148 S.W.3d at 226 (relying on its analysis of whether the exclusion of defendant's evidence was a constitutional error as also evidencing that the error was harmless). Appellant's cross-examination of M.S. demonstrated that her testimony before trial concerning appellant's use of a knife or a gun was, at best, inconsistent and, at worst, a fabrication. Indeed, appellant's overall questioning of M.S. regarding any specific reference to a knife or a gun during the videotaped interview indicated that M.S. had not mentioned either.

M.S.'s testimony concerning the weapons was further called into doubt by the testimony of Evans, the outcry witness, which reflected that she was unaware of appellant's alleged use of a weapon. Most importantly, Detective Ballard, after stating she had observed the interview as it was being taped, also indicated in her testimony that she was unaware of appellant's use of a weapon.

Moreover, although Stephenson would have testified M.S. had never mentioned that appellant threatened her with a weapon, appellant also acknowledged in his offer of proof that Stephenson would have testified that she never specifically asked M.S. about any weapons. We can only speculate as to how those two statements would be considered by a jury, but the import of Stephenson's testimony—if any—regarding M.S.'s failure to mention weapons during the interview would likely be diminished by Stephenson's statement

that she never directly asked M.S. about any weapons.

Under the Texas Penal Code, aggravated sexual assault of a child occurs when a person, either intentionally or knowingly, causes the penetration of the child's anus or sexual organ by any means if the victim is younger than 14 years old. TEX. PEN. CODE ANN. § 22.021(a) (Vernon 2003 & Supp.2004–05); *see Facundo v. State,* 971 S.W.2d 133, 135 (Tex.App.-Houston [14th Dist.] 1998, pet. ref'd). Here, M.S., eight years old at the time of the charged offenses, testified that appellant inserted his penis into her vagina. The State's medical expert, Dr. Michelle Lyn, had examined M.S. and testified that she observed redness on M.S.'s vagina, indicating "some type of penetration or attempted sexual intercourse" consistent with a sexual abuse victim. Whether appellant had used a weapon during the assaults was not a factor precluding his conviction.

Considering the entire record, we conclude the exclusion of Stephenson's testimony did not affect appellant's substantial rights. Based on appellant's proffer of Stephenson's testimony, it would not have added significantly to his defense, nor did its exclusion result in a substantial and injurious affect on the jury's verdict.

Accordingly, we affirm the judgment of the trial court.