ACCEPTED
01-14-00335-CR
FIRST COURT OF APPEALS
HOUSTON, TEXAS
7/10/2015 6:40:30 PM
CHRISTOPHER PRINE
CLERK

No. 01-14-00335-CR
No. 01-14-00336-CR

IN THE COURT OF APPEALS FOR THE
FIRST JUDICIAL DISTRICT OF TEXAS
AT HOUSTON, TEXAS

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
7/10/2015 6:40:30 PM
CHRISTOPHER A. PRINE
Clerk

CAUSE NOS. 12-DCR-061920 & 12-DCR-061921
IN THE 240TH DISTRICT COURT
FORT BEND COUNTY, TEXAS

---

**DAMION GENTRY, Appellant**

**VS.**

**STATE OF TEXAS, Appellee**

---

**STATE'S BRIEF ON DIRECT APPEAL**

---

JOHN F. HEALEY, JR.
District Attorney, 268th Judicial District
Fort Bend County, Texas

Tyra McCollum
Assistant District Attorney

Gail Kikawa McConnell
SBOT #11395400
Fort Bend County, Texas
301 Jackson Street, Room 101
Richmond, Texas 77406
(281) 341-4460 / (281) 238-3340 (fax)
Gail.McConnell@fortbendcountytx.gov

Counsel for Appellee

# IDENTITY OF PARTIES AND COUNSEL

Pursuant to Tex. R. App. P. 38.2(a)(1)(A), the State supplements Appellant's

list of parties to the trial court's final judgment with the names and addresses of all

Counsel for Appellee:

| | |
|---|---|
| Gail Kikawa McConnell | Assistant District Attorney |
| 301 Jackson Street | on Appeal |
| Richmond, Texas 77469 | |

Juvenile Court Judge at the Certification Hearing:

| | |
|---|---|
| Hon. Susan Lowery | County Court at Law Three |
| 301 Jackson Street | Fort Bend County, Texas |
| Richmond, Texas 77469 | |

Trial Court Judge at the Motion to Suppress Hearing:

| | |
|---|---|
| Hon. Thomas R. Culver, III | 240th District Court |
| (Retired as of June 30, 2015) | |
| c/o 240th District Court | |
| 301 Jackson Street | |
| Richmond, Texas  77469 | |

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

STATEMENT OF ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.     Facts relating to Appellant's identification and apprehension . . . . . . 1

    B.     Facts relating to the aggravated robbery of Nelson Escobar in Rosenberg, appeal number 01-14-00335-CR . . . . . . . . . . . . . . . . . . 4

    C.     Facts relating to the aggravated robbery of Masario Garza investigated by the Sheriff's Department, appeal number 01-14-00336-CR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

SUMMARY OF THE STATE'S ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . 10

STATE'S ARGUMENT AND AUTHORITIES

In Response to Point of Error One:  The evidence is factually sufficient to support the trial court's findings, and the court did not abuse its discretion in certifying Appellant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    A     Standard of review of a juvenile court's decision to certify a juvenile as an adult . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    B.     The evidence is sufficient to support the juvenile court's findings on the four factors required by Subsection 54.02(f)  . . . . . . . . . . . 15

1. Appellant concedes the first finding that the offenses were committed against the person . . . . . . . . . . . . . . . . . . . . . . . . . 17

2. Dr. Axelrad's opinion that Appellant's brain was damaged was based on Appellant's self-report . . . . . . . . . . . . . . . . . . . 18

3. Appellant minimizes the evidence of his criminal record and history as "minimal and non-violent" . . . . . . . . . . . . . . . 20

4. The seriousness of Appellant's offenses, the escalation of his criminal activities, his conduct disorder, and the fact that the all available resources have been expended support the trial court's finding that the public cannot be protected and rehabilitation in the juvenile system is remote . . . . . . . . 23

5. The record substantiates the juvenile court's specific factual findings, and the court did not abuse its discretion in certifying Appellant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

In Response to Point of Error Two:  Appellant's written statement was not the product of an audio recording and was taken in accordance with law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

A. Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

B. Appellant's written statement was taken in accordance with Section 51.095, and no abuse of discretion in admitting the statement is shown . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

In Response to Point of Error Three:  Any rational trier of fact could find beyond a reasonable doubt the element of Appellant's intent to commit theft in approaching Mr. Garza's vehicle with a gun . . . . . . . . . . 34

A. Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

B. The finding of guilt in the robbery of Marsario Garza is warranted by the cumulative force of all the incriminating evidence. . . . . . . . 37

iii

PRAYER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

# INDEX OF AUTHORITIES

**CASES**                                                                   **Page**

Burden v. State,
     55 S.W.3d 608 (Tex. Crim. App. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Carmouche v. State,
     10 S.W.3d 323 (Tex. Crim. App. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Delapaz v. State,
     No. 05-11-01465-CR, 2013 WL 1896187
     (Tex. App.--Dallas May 6, 2013, pet. ref'd)
     (not designated for publication) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28-29

Dewberry v. State,
     4 S.W.3d 735 (Tex. Crim. App. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Moon v. State,
     451 S.W.3d 28 (Tex. Crim. App. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Moon v. State,
     410 S.W.3d 366 (Tex. App.--Houston [1st Dist.] 2013),
     *aff'd* 451 S.W.3d 28 (Tex. Crim. App. 2014) . . . . . . . . . . . . . . . . . . . . 16, 26

Gonzales v. State,
     No. 04-14-00352-CR, 2015 WL 2124773
     (Tex. App--San Antonio May 6, 2015, pet. filed June 1, 2015) . . . . . . 16, 26

Guzman v. State,
     955 S.W.2d 85 (Tex.Crim.App.1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Jackson v. Virginia,
     443 U.S. 307 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Jeffley v. State,
     38 S.W.3d 847 (Tex. App.--Houston [14th Dist.] 2001, pet. ref'd) . . . 28-29

Johnson v. State,
     871 S.W.2d 183 (Tex. Crim. App. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Powell v. State,
     194 S.W.3d 503 (Tex. Crim. App. 2006) . . . . . . . . . . . . . . . . . . . . 35-36, 38

Ross v. State,
     133 S.W.3d 618 (Tex. Crim. App. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 35

State v. Ross,
     32 S.W.3d 853 (Tex. Crim. App. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 28

## STATUTES AND RULES

CODE OF CRIMINAL PROCEDURE
     Section 38.22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 33
     Section 38.23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

FAMILY CODE
     Section 51.095 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27-31, 33-34
     Section 54.02 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-15, 23

PENAL CODE
     Section 29.01 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37
     Section 29.02 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
     Section 29.03 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
     Section 31.03 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

RULES OF APPELLATE PROCEDURE
     Rule 38.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i, 1

RULES OF EVIDENCE
     Rule 404 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

No. 01-14-00335-CR
No. 01-14-00336-CR

IN THE COURT OF APPEALS FOR THE
FIRST JUDICIAL DISTRICT OF TEXAS
AT HOUSTON, TEXAS

CAUSE NOS. 12-DCR-061920 & 12-DCR-061921
IN THE 240TH DISTRICT COURT
FORT BEND COUNTY, TEXAS

---

**DAMION GENTRY, Appellant**

**VS.**

**STATE OF TEXAS, Appellee**

---

**STATE'S BRIEF ON DIRECT APPEAL**

---

**TO THE HONORABLE COURT OF APPEALS:**

## STATEMENT OF THE CASE

Appellant appeals his two convictions for aggravated robbery with a firearm, which were both committed on or about January 19, 2012, when Appellant was fourteen years and ten months old. [2RR7, 6RR66, 9RR4]

On November 15, 2012, after a lengthy certification hearing, the juvenile court waived its jurisdiction and transferred Appellant's two aggravated robbery cases to

the district court. [2CH[1] 177-78] A jury found Appellant guilty of both offenses and assessed punishment for each offense at fifty years imprisonment and a $10,000 fine. [13RR4-5] The trial court sentenced Appellant in accordance with the jury's verdict on April 17, 2014. [13RR1, 6] Appellant timely filed his notices of appeal the same day. [CR-335 at 265, CR-336 at 338]

## STATEMENT OF ORAL ARGUMENT

A thorough record was made at the certification hearing of Appellant's maturity and culpability as the shooter in two aggravated robberies against unsuspecting, hard-working individuals, and the same thorough presentation was made at trial. Appellant committed these aggravated robberies after the Fort Bend County Juvenile Probation Department had worked with him for the nearly five years (beginning when Appellant was ten years old) and had expended all available services. The State believes its brief sets forth the relevant evidence in support of the decisions of the juvenile court, the trial court, and the jury; and oral argument will unlikely be of assistance to the Court.

---

[1] For ease in reference, the State will adopt Appellant's system of references to the record as shown on page iv of his brief. The Certification Hearing is "___CH___" and the Suppression Hearing is "___SH___." The Clerk's Records will be referenced by the last three numbers in each cause number in this Court.

**STATEMENT OF FACTS**

Pursuant to Tex. R. App. P. 38.2(a)(1)(B), the State challenges all factual assertions contained in Appellant's brief, except for inculpatory admissions, and submits its version of the relevant facts below and in its response to Appellant's grounds for review. For ease in reference, the State adopts Appellant's scheme of referencing the record:

CH = Reporter's Record of the Certification Hearing

SH = Reporter's Record of the Hearing on Appellant's Motion to Suppress

RR = Reporter's Record of the Jury Trial in the District Court

CR-335 = Clerk's Record in No. 01-14-00335-CR

CR-336 = Clerk's Record in No. 01-14-00336-CR

*A.      Facts relating to Appellant's identification and apprehension*

At about 3:30 a.m. on January 19, 2012, Rosenberg Police Officer Thompson was dispatched to the Summer Lakes Subdivision to assist the fire department with a car fire. [4RR28, 30, 37, 39] One of the arson investigators asked Officer Thompson to check for a suspicious vehicle at an apartment complex that was under construction. [4RR42] The apartment complex was behind the JCPenney store in the Brazos Town Center just north of the subdivision. [4RR37, 42]

Officer Thompson determined that the suspicious vehicle was "the construction

1

crew there to pour cement." [4RR42] He then heard gunfire from the parking lot in front of the Academy store near JCPenney in the Brazos Town Center. [4RR35, 43, 44] Officer Thompson testified that he heard three or four shots, then shortly thereafter, "heard tires squealing." [4RR45] Officer Thompson did not see any other vehicles leaving except for "one gray Ford pickup truck that was in the parking lot." [4RR45] Officer Thompson saw the vehicle "moving pretty quick." [4RR48] The truck ran a stop sign without slowing, then turned right on FM 762. [4RR48, 50] Officer Thompson got in his vehicle and followed the gray truck into the Summer Lakes Subdivision. [4RR50]

Officer Thompson activated his emergency lights and his in-car video recorder when the truck slowed to a stop on the wrong side of the road in front of a residence. [4RR53-54, 71; State's Ex 2] As Officer Thompson exited his vehicle, the passenger, later identified as Appellant, got out. [4RR56] Officer Thompson told Appellant to get back into the vehicle, which he did, and Officer Thompson ordered "the driver to walk back towards me." [4RR56]

Officer Thompson testified that as he was speaking with the driver,[2] who was giving answers that were obviously incorrect, dispatch sent out a message that a

---

[2] Identified by his driver's license as Daniel DeSantiago-Caraza. [5RR106] Mr. DeSantiago-Caraza's name is misspelled in the reporter's record as "Daniel De Santiago Carraza."

2

shooting had just occurred at the Academy. [4RR58] The message was within the driver's hearing and in concern for his safety, Officer Thompson drew his service weapon, ordered the driver to the ground, and ordered Appellant out of the vehicle and to the ground as well. [4RR59] Officer Thompson then notified dispatch that he possibly had the suspects involved in the shooting. [4RR61] While Officer Thompson waited for back up, Appellant and the driver started speaking in Spanish, then Appellant got up and ran towards the front of the truck out of Officer Thompson's sight. [4RR64] After Officer Thompson again made eye contact with Appellant, Appellant took off from the scene. [4RR66]

Other officers arrived on scene in response to Officer Thompson's call for backup, including Fort Bend County Sheriff's Deputy St. Hilaire. [5RR101, 104] Deputy St. Hilaire testified that the Sheriff's Department was investing an earlier shooting that was thought to be linked to the shooting in Rosenberg. [5RR105] Deputy St. Hilaire met with Officer Thompson for a quick briefing and passed that information on to his supervisors. [5RR105]

Rosenberg Detective Leonhardt was dispatched to the scene of the stop, and once there, viewed Officer Thompson's in-car video. [5RR59, 62] Det. Leonhardt immediately recognized fourteen-year-old Appellant as the passenger. [5RR63] Det. Leonhardt and other detectives went to Appellant's last known address, where Appellant's step-father allowed them to enter the trailer and consented to a search.

3

[5RR73-74, 75] Appellant was detained as he exited the bathroom and was transported directly to Justice of the Peace Mary Ward's office for his magistrate's warning. [5RR74, 79-80]

Appellant gave a written statement in accordance with the law. [6RR50-59, 64-71, 96; State's Ex 25 (Appendix A)] In his written statement, Appellant admitted being present at the car fire, the shooting at the Academy in Rosenberg (Appeal No. 01-14-00655-CR), and the shooting that the Sheriff's Department was investigating and thought was linked to the shooting in Rosenberg (Appeal No. 01-14-00656-CR). [State's Ex 25]

> B. *Facts relating to the aggravated robbery of Nelson Escobar in Rosenberg, appeal number 01-14-00335-CR*

Nelson Alberto Mejia Escobar testified that he worked for Federal Maintenance cleaning store parking lots at night. [5RR6,7] On January 19, 2012, Mr. Escobar and two other workers were cleaning the parking lot at the Brazos Town Center. [5RR8, 10, 11] Mr. Escobar was cleaning the area in front of Academy when "an F-150 gray in color, one and a half cabin with a chrome covering on top" drove up to his location. [5RR11, 15, 16] There were two Hispanic men in the truck. [5RR17-18] The passenger spoke to Mr. Escobar in English, but Mr. Escobar told him in Spanish that he does not speak English. [5RR21] Mr. Escobar testified that the passenger was between fifteen and sixteen years of age and was dressed in black clothing with

4

black gloves.  [5RR18]  Mr. Escobar could not see the driver because the driver moved the truck forward when the passenger got out.  [5RR18-19]

The passenger got out of the truck with a black firearm, pointed it at Mr. Escobar's head, and in Spanish told Mr. Escobar to give him $150.  [5RR18, 19, 21] Mr. Escobar took his keys out and emptied out his pockets to show the passenger that he had no money.  [5RR20, 22]  The passenger asked for the keys, and Mr. Escobar gave them up because the passenger was pointing a gun at him.  [5RR23]  Mr. Escobar asked the passenger, "Have mercy on me," "I beg of you, have mercy on me," "Don't do anything to me," "Have pity on me."  [5RR25]  When the passenger lowered the gun, the driver told the passenger, "Shoot him."  [5RR26]

Mr. Escobar testified that the passenger then turned the gun "around with the grip facing the other side.  And then he goes like this, and then he hits me like this here.  He hits me here like this with the gun.  And then right away I bring my hand up like this, and I push it away to the other side."  [5RR26]  Mr. Escobar then turned and ran for his life.  [5RR26]  The passenger chased Mr. Escobar and shot three or four times.  [5RR26-27]  Mr. Escobar tripped and fell.  [5RR28]  The passenger stopped shooting and said, "I already killed him," then ran back to the truck, got in, and left.  [5RR28]

Rosenberg Police Detective Monfort testified that he responded to the scene of the shooting and Mr. Escobar "was very scared.  He was shaking, his legs were

5

shaking, his hands were shaking. And he had a look, like a – what we call a thousand-yard stare. He was kind of like almost looking through me as he was, you know, trying to express his feelings that night." [5RR86, 92-93] Video surveillance recordings also corroborated Mr. Escobar's version of the shooting and showed these events began at 3:28 a.m. [5RR31, State's Exhibit 10] In the courtroom, Mr. Escobar identified Appellant as the person who shot at him. [5RR37]

Three 9mm Winchester shell casings were recovered from the area of the parking lot where Mr. Escobar said he was shot. [5RR86-91, State's Exs 13, 14, 15] Toolmarks on these casings matched those on two casings recovered from the truck that Appellant was riding in when he was stopped. [5RR67, 7RR31, 33] Appellant admitted in his written statement, "and then Academy and a man [Daniel] hit him with the gun the man ran then he fired fired a round then threw the gun at me and I fired but missed and hit the floor Daniel got mad and said your waisting my bullets hoe and then fired 1 or 2 rounds we left." [State's Ex 25, statement at 1-2, verbatim] Appellant gave "Additinol Information:"

> I confroted the man. Give me wat you got Daniel translated and then got out the truck and hit the man with the gun and then the man ran and he shot him He then threw the gun at me and I fired but missed and hit the floor then Daniel grabbed the gun got mad and said your waisting my bullets hoe and fired one or two more rounds.

[State's Ex 25, statement at 3, verbatim]

6

C. *Facts relating to the aggravated robbery of Masario Garza investigated by the Sheriff's Department, appeal number 01-14-00336-CR*

Masario Garza testified that in January 2012, he was sixty-eight years old and worked for the National Oil Company as a press operator. [6RR7, 8] Mr. Garza worked a shift from 4:00 a.m. to 2:30 p.m. [6RR8] Mr. Garza lived in Rosenberg and worked in Houston and had a regular route that he took every night traveling on old Highway 90. [6RR9] Mr. Garza left home at 2:45 or 3:00 a.m. to make it to work on time. [6RR10]

On January 19, 2012, as Mr. Garza approached the traffic light on Highway 90 and FM359, the light turned red, so he slowed down. [6RR11-12] A "gray or silver looking" truck passed Mr. Garza on the inside lane and stopped at the light. [6RR12, 14] Mr. Garza testified that he saw "this young boy get out of the passenger side. And at first, I thought he was going to like ask me for directions or I thought maybe he was going to check something in the bed of the truck." [6RR15] But two seconds after Mr. Garza saw the boy, he saw that the boy had a gun in his right hand at the side of his leg. [6RR17] Mr. Garza testified:

Q:   What did you see then after you saw the gun?

A:   What did I see? I just stepped on the gas and took off.

Q:   All right. And why did you do that once you saw that gun?

A:   Because I thought, you know, this is no good here because he's

> going to try to rob me or something, you know. I wasn't going to wait around and see what he was going to do.
>
> Q: Okay. And when he – did you ever see him – did something else ever happen after that?
>
> A: When I took off, he shot into my car, driver side window, two times.

[6RR18]

Mr. Garza's side window was rolled up, and the glass shattered and cut Mr. Garza on the left side of his face and right hand. [6RR18-19] Mr. Garza continued driving down Highway 90, and in his rear view mirror, saw the truck coming up behind him. [6RR22] The truck passed Mr. Garza's vehicle on the inside lane and as it passed by, Mr. Garza, who was on the phone with the 9-1-1 operator, heard two more shots being fired. [6RR24]

The truck then made a U-turn at the crossover and came back towards Mr. Garza's vehicle. [6RR26] As the truck passed, Mr. Garza heard two more shots. [6RR27] Mr. Garza finally pulled into the parking lot of a little restaurant and the police were there shortly after he stopped. [6RR28, 29]

Former Fort Bend Sheriff's Deputy Gotting testified that she was called about a shooting on Highway 90 at about 3:00 a.m. [5RR114, 117] Deputy Gotting met Mr. Garza and described him as "very shaken. He seemed somewhat scatter-brained. He was very alarmed at what had just occurred." [5RR119] Consistent with Mr.

8

Garza's statement, the window of the driver's side door was shattered and there were two bullet holes on the inside of the front passenger door. [6RR121, 122] One projectile was recovered from the door. [6RR122]

One fired cartridge case was recovered before the intersection of Highway 90 and FM 359. [7RR91-92] This casing matched the casings recovered from the Academy parking lot and the truck in which Appellant was riding. [7RR50, State's Ex 28]

Mr. Garza testified that he saw the boy for "like two seconds" and described him as Spanish looking, in his late teens, with lighter skin tone. [6RR16] Appellant admitted in his written statement that "Thursday A.M. on 90 Daniel[3] polled [sic] up to the car I got out acted like I had a gun and then Daniel shot cause he really had the gun the civillain [sic] drove off we chased him Daniel fired 3 more rounds." [State's Ex 25, page 1 of the statement form, verbatim]

---

[3]     Co-defendant, twenty-two-year-old Daniel Desantiago Caraza. [5RR106, 6RR109]

9

## SUMMARY OF THE STATE'S ARGUMENT

As best the State can discern, Appellant asserts the evidence is factually insufficient to support the juvenile court's findings on factors that the court is required to consider by statute before certifying a juvenile to stand trial in district court. The findings in the juvenile court's order waiving its original jurisdiction and transferring Appellant's two cases for aggravated robbery is supported by the evidence adduced at the lengthy and thorough certification hearing that included the testimony of Dr. Karen Gollaher, a psychologist; Dr. David Axelrad, a psychiatrist; Shane Marvin, a court liaison officer with the Fort Bend County Juvenile Probation Department; both victims; officers and detectives from the Rosenberg Police and Fire Departments and the Fort Bend County Sheriff's Office; and Justice of the Peace Mary Ward who gave Appellant his juvenile magistrate's warnings.

Appellant's offenses were committed on innocent people on their way to work or on the job, and were wholly unprovoked. Appellant pursued and shot at each victim at close range. Appellant committed these offenses after the Juvenile Probation Department had expended all available resources with him, having worked with Appellant since he was ten years old. Appellant has an average intelligence and is street savvy. Psychological testing revealed Appellant has "Conduct Disorder," and Dr. Gollaher opined that Appellant was on the path to antisocial behavior. The

juvenile court's findings are not so against the great weight and preponderance of the evidence as to be clearly wrong or unjust, and no abuse of discretion is shown.

Appellant asserts that because the audio recording of Appellant's interview with detectives was suppressed, his written statement should also be suppressed. Appellant fails to tell this Court that the audio recording and testimony about Appellant's oral statements during the interview were suppressed because Judge Ward's magistrate warnings, which were given to Appellant before his interview, were not recorded as required by Section 51.095, Family Code. The trial court did not make a finding that Appellant's statements were involuntary. The admissibility of Appellant's written statement is governed by Section 51.095, Family Code. Judge Ward's testimony that she complied with the requirements of Section 51.095 is corroborated by the completed form used to take Appellant's statement, and the statement is admissible. The trial court did not abuse its discretion in admitting Appellant's written statement.

In claiming the evidence is insufficient to support his conviction for the aggravated robbery of Marsario Garza in Cause No. 12-DCR-061921 in the district court; No. 01-14-00336-CR in this Court, Appellant fails to include all of the evidence adduced at trial. Specifically, Mr. Garza's testimony that he thought he was going to get robbed and stepped on the gas because he was not going to wait around to find out; and that within about a half hour of the robbery of Mr. Garza, Appellant

11

demanded $150 from Nelson Escobar, also at gunpoint. Any rational trier of fact could find beyond a reasonable doubt from the weight of all the evidence that Appellant was in the course of committing theft and with the intent to obtain property, threatened Mr. Garza with a deadly weapon.

## STATE'S ARGUMENT

### Appellant's Point of Error One

"Appellant contends that the juvenile court's reasons for certifying Appellant were insufficient and abused its discretion." [Br at 2, 15]

### State's Answer

The evidence is factually sufficient to support the trial court's findings, and the court did not abuse its discretion in certifying Appellant.

### Argument

In his first point of error, "Appellant contends that the juvenile court's findings do not support its decision to certify Appellant in this case." [Br at 16] Appellant also asserts, "The juvenile courts [sic] reasons for transfer to criminal court were insufficient based upon the evidence presented under Section 54.02(f)." [Br at 17] Appellant then provides record citations and argues in his favor the four factors that must be considered under Section 54.02(f). [Br at 17-24] As best the State can understand, Appellant's complaint is that the juvenile court's findings on the four statutory factors is factually insufficient.

12

*A      Standard of review of a juvenile court's decision to certify a juvenile as an adult*

Section 54.02(a)(3) provides in relevant part that "[t]he juvenile court may waive its exclusive original jurisdiction and transfer a child to the appropriate district court or criminal district court for criminal proceedings if:

(1)    the child is alleged to have violated a penal law of the grade of felony;

(2)    the child was:

      (A)    14 years of age or older at the time he is alleged to have committed the offense, if the offense is a . . . felony of the first degree, and no adjudication hearing has been conducted concerning that offense;

      . . . .

(3)    after a full investigation and a hearing, the juvenile court determines that there is probable cause to believe that the child before the court committed the offense alleged and that because of the seriousness of the offense alleged or the background of the child the welfare of the community requires criminal proceedings.

Tex. Fam. Code § 54.02(a) (West 2012).

Subsection 54.02(f) provides,

(f)    In making the determination required by Subsection (a) of this section, the court shall consider, among other matters:

      (1)    whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against the person;

      (2)    the sophistication and maturity of the child;

13

(3) the record and previous history of the child; and

(4) the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court.

Tex. Fam. Code § 54.02(f) (West 2012).

"[I]n evaluating a juvenile court's decision to waive its jurisdiction, an appellate court should first review the juvenile court's specific findings of fact regarding the Section 54.02(f) factors under "traditional sufficiency of the evidence review." But it should then review the juvenile court's ultimate waiver decision under an abuse of discretion standard.

That is to say, in deciding whether the juvenile court erred to conclude that the seriousness of the offense alleged and/or the background of the juvenile called for criminal proceedings for the welfare of the community, the appellate court should simply ask, in light of its own analysis of the sufficiency of the evidence to support the Section 54.02(f) factors and any other relevant evidence, whether the juvenile court acted without reference to guiding rules or principles.

In other words, was its transfer decision essentially arbitrary, given the evidence upon which it was based, or did it represent a reasonably principled application of the legislative criteria? And, of course, reviewing courts should bear in mind that not every Section 54.02(f) factor must weigh in favor of transfer to justify the juvenile court's discretionary decision to waive its jurisdiction.

*Moon v. State*, 451 S.W.3d 28, 47 (Tex. Crim. App. 2014) (paragraph breaks added,

footnote citation omitted).

14

B.     *The evidence is sufficient to support the juvenile court's findings on the four factors required by Subsection 54.02(f).*

With regard to the complained-of Subsection 54.02(f) factors, the juvenile court found in each case:

> The child the subject of this suit was fourteen (14) years of age at the time of the alleged offenses made the basis of this suit. The child is currently fifteen (15) years of age.
>
> The offenses are against the person.
>
> That DAMION GENTRY is sufficiently sophisticated and mature enough to be tried as an adult
>
> That DAMION GENTRY is able to assist his attorney in his defense.
>
> That DAMION GENTRY has a record and referral history and that previous history is such that DAMION GENTRY should stand trial as an adult.
>
> That the public cannot be protected if DAMION GENTRY remains in the juvenile system and that the likelihood that the juvenile system could rehabilitate DAMION GENTRY is very remote.

[CR-335 at 226, CR-336 at 285]

> Pertinent to the statutory factors, the juvenile court further found:
>
> Both acts made the basis of this suit would be felonies of the first degree under the penal laws of the State of Texas if committed as an adult.
>
> The alleged offenses were of a serious nature, and involve the use of a deadly weapon. Additionally, that one victim was found to be over the age of sixty-five (65) years.

15

That because of the record and previous history of the child and because of the extreme and severe nature of the alleged offenses, the prospects of adequate protection of the public, and the likelihood or reasonable rehabilitation of the child by use of the procedures, services, and facilities which are currently available to the Juvenile Court are in doubt.

Therefore, the Court finds that after considering all of the testimony, diagnostic study, social evaluation, and full investigation of the child's circumstances and the circumstances of the alleged offenses, the Court finds it is contrary to the best interest of the public to remain under juvenile jurisdiction.

The Court specifically finds that because of the seriousness of the alleged offenses and the background of the child, the welfare of the community requires criminal proceedings.

[CR-335 at 226-27, CR-336 at 285-86]

"Under a factual sufficiency challenge, we consider all of the evidence presented to determine if the court's finding is so against the great weight and preponderance of the evidence as to be clearly wrong or unjust." *Moon v. State*, 410 S.W.3d 366, 371 (Tex. App.--Houston [1st Dist.] 2013), *aff'd* 451 S.W.3d 28 (Tex. Crim. App. 2014), *see also Gonzales v. State*, No. 04-14-00352-CR, 2015 WL 2124773, at *4-*5 (Tex. App--San Antonio May 6, 2015, pet. filed June 1, 2015) (applying *Moon*).

The evidence before the juvenile court at the certification hearing included:

- The psychological evaluation report of Dr. Karen K. Gollaher. [State's Exhibit 14]

- The testimony of Dr. Gollaher. [1CH293-392]

- The forensic psychiatric consultation report of Dr. A. David Axelrad, which included the neuropsychological evaluation report of Dr. Larry Pollock. [Respondent's Exhibit 1]

- The testimony of Dr. Axelrad [2CH75-155]

- The testimony of Rosenberg Police Officer Thompson [1CH21-74], and Lieutenant Dunn [1CH173-231].

- The testimony of Nelson Escobar, the victim of the Rosenberg robbery [1CH 75-108], and his co-worker Jesus Herrera [1CH109-15].

- The surveillance video recording of the aggravated robbery showing Appellant chasing Mr. Escobar and shooting at close range. [State's Ex 9]

- The testimony of Marsario Garza, the victim of the aggravated robbery on Highway 90 and FM 359. [1CH116-35]

- The testimony of Fort Bend County Sheriff's Detective McKinnon [1CH232-57], and Detective Chesser. [1CH258-79]

- The testimony of Justice of the Peace Mary Ward, who administered the magistrate's warnings to Appellant. [1CH136-71]

- Appellant's magistrate's warnings and written statement. [State's Exhibit 12]

- The testimony of fire investigator John Villareal. [1CH280-91]

The State will summarize Appellant's argument with regard to the findings and show the evidence supporting the findings, none of which are clearly wrong or unjust.

> 1. *Appellant concedes the first finding that the offenses were committed against the person.*

Appellant concedes as correct the first finding that the offenses were committed against the person. [Br at 17-18]

### 2. Dr. Axelrad's opinion that Appellant's brain was damaged was based on Appellant's self-report.

Appellant challenges the juvenile court's second finding, citing the testimony of Dr. Axelrad[4] that "based on the history [Appellant] shared with me," Appellant has "a brain that has been injured." [Br at 19] Appellant argues, "the evidence clearly showed Dr. Axelrad, a psychiatrist, for over 40 years, testified that Appellant suffered from head injuries and neuropsychological deficits that are involving the same areas of the brain that have not been fully matured or developed or mamelonated. (RR, CH2 at 91)." [Br at 19, verbatim]

In support of the trial court's finding, the evidence showed:

- Dr. Gollaher disagreed with Dr. Pollock's[5] diagnosis and conclusions upon which Dr. Axelrad relied. [1CH318, 2CH98-100] Specifically, Dr. Gollaher did not see significant neuropsychological impairment. [1CH317-18]

- Dr. Gollaher testified that Appellant's IQ score of 107 is in the average range. [1CH302] This score is confirmed by an earlier score of 108 as obtained at Fort Bend County juvenile detention a few months prior, and Dr. Pollock obtained a full scale score of 93, "in the Average range." [CH-State's Ex 14 at 5, CH-Respondent's Ex 1, Attach C at 5]

- Dr. Gollaher reported that Appellant read in the average range and equivalent to eighth grade levels, his spelling was in the average range and equivalent to tenth grade levels, but his math was in the low-average range and equivalent to fifth grade levels. [CH-State's Ex 14 at 5] Dr. Pollock obtained similar results, "Sentence Comprehension was at the 10th grade level. Spelling was

---

[4] Misspelled "Axelrod" in the reporter's record.

[5] Misspelled "Polluck" in the reporter's record.

18

at the 8th grade level.  Math Computation was average at the 6th grade level."
[CH-Respondent's Ex 1, Attach C at 4]

- Dr. Gollaher testified that in her interview with Appellant she did not find any mental health impairment, psychosis, or anything that impacted Appellant's ability to understand the difference between right and wrong.  [1CH313]

- Dr. Gollaher testified that Appellant is "capable of making decisions," and any presence of ADHD "[c]ertainly didn't impair that ability."  [1CH336-37]

- Dr. Gollaher testified with regard to Appellant's criminal sophistication, that Appellant "began to act out, initially at a young age, mainly related to his emotions.  [There] were reports of a number [of] fights, including the gang-related fights as well as individual fights, moving to being involved with gangs, being jumped.  So again, that pattern of seeing someone involved with increasingly more violent crime. . . . [C]ertainly when you see someone who's already engaged in a pattern of violent behavior, you're wondering what's next[?]" [1CH339] Dr. Gollaher found that Appellant already has a history of violence and is criminal sophisticated.  [1CH340]

- Justice of the Peace Mary Ward testified that in the course of the magistrate's warnings, Appellant "came across to me as that he was very street wise, had learned -- had that knowledge and could pretty much handle being a 17 or 18 year-old easily." [1CH162] Appellant was a "[m]ature young man." [1CH162]

- Rosenberg Police Detective Tracie Dunn testified that during the interview with detectives, Appellant was "extremely" street savvy, "very street smart," "very articulate," and "intelligent on top of that." [1CH202] Det. Dunn further testified that Appellant "knows how to kind of work a room," is "very polite," has good manners, and "it's like he almost knows what to say and what not to say.  He's very careful about it.  He's very calculated on what he says." [1CH202]

- Det. Dunn further testified that Appellant "never demonstrated or gave any impression . . . that in any way he was influenced by anyone in that car," referencing his twenty-two year old co-defendant, Daniel Desantiago Caraza. [1CH211]

19

- Fort Bend County Sheriff's Detective David McKinnon[6] testified that he thought Appellant was "[m]ore mature for his age," "is pretty street savvy for his age," and did not appear to have any significant brain issues. [1CH245-46, 249-50]

- Shane Marvin, Fort Bend County Juvenile Probation Department court liaison officer, testified that Appellant is a leader in good and bad ways. [2CH8] Appellant could get other juveniles stirred up and could also tell others "hey, look, get out here, do what you need to do, and go to court, don't make the same mistakes I made." [2CR8-9]

When all of the evidence is considered, the juvenile court's finding "[t]hat DAMION GENTRY is sufficiently sophisticated and mature enough to be tried as an adult" is *not* so against the great weight and preponderance of the evidence as to be clearly wrong or unjust.

### 3. Appellant minimizes the evidence of his criminal record and history as "minimal and non-violent."

Appellant challenges the juvenile court's finding on the third statutory factor by citing a portion of the testimony of Shane Marvin, the juvenile probation department's court liaison officer. [Br at 20] Appellant minimizes his record in describing it as "minimal and non-violent." [Br at 20] Appellant also infers that Mr. Marvin had recommended that Appellant be sent to TJJD, rather than certification [Br at 20], despite Mr. Marvin's testimony that his department does not make recommendations on certification [2CH66].

---

[6]      Misspelled "McKenna" in the reporter's record.

In support of the trial court's finding, the evidence showed:

• Mr. Marvin testified that since 2007 to the present, the department has had twelve referrals. [2CH18] The first referral on was for Appellant being a run away when he was ten years old. [2CH19]

• Mr. Marvin testified that before committing the instant aggravated robberies, Appellant had access to individual, group, and behavior-modification counseling; had been twice placed on probation and given community service; had gone through a lock-down placement for drug treatment; had received alcohol and drug counseling services multiple times with the juvenile probation department; had been given mental health services; and was placed outside his home. [2CH20-21] Appellant was also placed in the TCOOMI turn-around program, JJAEP juvenile boot camp, and a male mentorship program. [2CH44, 51] In short, Appellant has been given access to every type of rehabilitative program the Fort Bend County Juvenile Probation Department had to offer and still committed these aggravated robberies. [2CH21]

• Mr. Marvin testified that since being held in juvenile detention from January 19, 2012, Appellant has had fourteen write-ups for excessive talking and disruption; not following instructions; fighting; refusing to attend class; taking a teacher's pen and lying about having permission to take it; kicking and hitting his cell door and yelling, "Fuck room confinement"; "stating he did not want any Hispanics with the blacks"; refusing to give up a pork chop bone while in his cell; refusing to give up his sheets and to make his bed; hitting the door multiple times and refusing to stop; calling another juvenile names and starting to walk toward that juvenile; possessing contraband, including needles hidden in his eyeglasses; trying to incite a riot by banging with his hand, kicking the door, flooding his room, and screaming for an hour. [2CH 23-32]

• Mr. Marvin testified that when Appellant was twelve years old, Appellant was placed on a twelve-month probation for assault of a public servant from May 28, 2009, until May 27, 2010. [2CH 37] Dr. Gollaher testified that the offense involved choking a teacher. [1CH322] Mr. Marvin testified that Appellant successfully completed that probation, but had two violations--one for threatening to blow up the school, and the other for leaving his mother's home and staying out until 8:30 to 9:00 p.m. with boys age sixteen and older and associating with another juvenile on probation. [2CH 37-38]

21

- Mr. Marvin testified that Appellant is a gang member of the Southwest Cholos. [2CH33] Appellant was placed on formal probation for six months from December 1, 2010, until June 26, 2011, for gang membership or gang solicitation. [2CH34, 39] Appellant had the number 13 on his belt, and writings, taggings, and drawings in his backpack. [2CH34] While on probation for gang membership, Appellant wore gang related items--a black and white bandana, an extra long belt, tagged textbooks, and flashed signs in front of his teachers in school. [2CH33] Appellant also has three dots on his knuckle that may reflect gang association. [2CH34]

  Mr. Marvin testified that Appellant "ultimately successfully completed" that probation, but had three violations and an additional Class C citation for destruction of school classes. [2CH39-40] Appellant violated his probation by wearing a bandana and failing to attend school, getting drunk with a blood alcohol content of .112, and drinking Mad Dog 20/20 and smoking spice. [2CH 40-41]

- Mr. Marvin testified that Appellant has tested positive five times for marijuana. [2CH34-35]

- Mr. Marvin testified that Appellant was absolutely not a candidate for probation. [2CH51]

- Mr. Marvin testified that based on the nature of Appellant's offenses--aggravated robbery with a deadly weapon and a pending arson charge, no placement facility would take Appellant. [2CH53]

- Mr. Marvin testified that the department has provided a "multitude of services" and placement to avoid removing Appellant from his home. [2CH54-55]

When all of the evidence is considered, the juvenile court's finding "[t]hat DAMION GENTRY has a record and referral history and that previous history is such that DAMION GENTRY should stand trial as an adult" is *not* so against the great weight and preponderance of the evidence as to be clearly wrong or unjust.

*4.     The seriousness of Appellant's offenses, the escalation of his criminal activities, his conduct disorder, and the fact that the all available resources have been expended support the trial court's finding that the public cannot be protected and rehabilitation in the juvenile system is remote.*

Appellant quotes testimony by Drs. Gollaher and Axelrad and argues that "[a]ll three[7] experts agreed and it is undisputed from the record that Appellant should benefit from rehabilitation and these problems could be treated and did require treatment." [Br at 21-23] Appellant does not provide argument regarding the first part of the fourth factor, "the prospects of adequate protection of the public." Tex. Fam. Code § 54.02(f)(4).

In support of the juvenile court's finding on the fourth statutory factor, the evidence shows that:

- Nelson Escobar was working at his job cleaning the parking lot in front of an Academy store when a gray F-150 truck pulled up near him. [1CH77, 80; State's Exhibit 10 at 3:28] Appellant got out of the truck with a gun, pointed it at Mr. Escobar's head, and demanded $150. [1CH83, 84] After Mr. Escobar turned his pockets inside out to show Appellant he had no money and begged for his life, Appellant took Mr. Escobar's keys and struck him with the gun. [1CH88] Mr. Escobar took off running and Appellant pursued, shooting three times in rapid succession at close range. [1CH89, State's Ex 10 at 3:28] When Mr. Escobar fell, Appellant turned and said, "I already killed him." [1CH104]

---

[7]     Dr. Axelrad relied on testing by Dr. Pollock. [2CH96-101] Dr. Pollock recommended that Appellant be provided cognitive intervention in Project Reentry, a program that Dr. Pollock directs. [2CH106, 115]

23

- Sixty-eight-year-old Masario Garza was driving his normal route to his 4:00 a.m. to 2:30 p.m. work shift at National Oil in Houston. [1CH117, 118, 135] As he slowed for the red light at Highway 90 and FM 359, he saw a truck stopped on the inside lane. [1CH120] A "young kid," Appellant, stepped out of the passenger's side of the truck, and Mr. Garza immediately saw he had a gun in his hand. [1CH121] Mr. Garza "stepped on the gas," and as he went by, Appellant shot twice into the vehicle. [1CH122] Mr. Garza testified that he thought he was going to be robbed or killed, and "I wasn't going to stick around to see which one." [1CH125] The driver's side window was shattered and Mr. Garza was cut on his face and hand by flying glass. [1CH131, 133] Two bullet holes were found on the inside of the front passenger's door near the door handle. [1CH131]

- Appellant told Det. McKinnon that when he and Blast (twenty-two-year-old Daniel Desantiago Caraza) pulled up next to the victim's vehicle, he was in the passenger's seat. [1CH240] Inconsistent with Mr. Garza's statement, Appellant said that he exited and held his hand like he had a gun and approached the victim's vehicle. [1CH240] Appellant said that Blast had the gun. [1CH240]

- Appellant told Detectives Dunn, Leonhardt, and McKinnon that he and Blast had been "flipping," i.e., driving around. [1CH194] With regard to the shooting on Highway 90, Appellant said that Blast wanted to get "his paper," i.e., money, and they had the specific intent to rob the person in that vehicle. [1CH241]

- While talking to the detectives, Appellant did not ask whether his victims were okay, their condition, or express any concern for them. [1CH204]

- Det. Dunn testified that Appellant never gave the impression that he was under the influence of anyone. [1CH211]

- Appellant did not admit to the car arson committed before 2:43 a.m. the same early morning as the aggravated robberies, but placed himself at that scene. [1CH211, 281, 284]

- Mr. Marvin, Fort Bend County Juvenile Probation, testified that the department had worked with Appellant since 2007 when Appellant was ten years old, and "as a department, we have exhausted everything." [2CH52, 67]

24

- Mr. Marvin testified that the department's recommendation was for placement in TJJD, where the decision to parole Appellant would be left to the TJJD staff after a three-year minimum stay. [2CH68]

- Dr. Gollaher was concerned that Appellant would need more than three years time to rehabilitate. [1CH364]

- Dr. Gollaher disagreed with Dr. Axelrad's and Dr. Pollock's opinions that Appellant has significant neuropsychological issues. [1CH367] Dr. Gollaher did not understand how Dr. Pollock arrived at his opinion given the raw data from his testing. [1CH369] Dr. Gollaher did not have any medical or factual information to support a conclusion that Appellant's cognitive disorder may be due in part to closed head injuries. [1CH372]

- Dr. Gollaher testified that there was no information to suggest that either victim provoked, agitated, picked at, said, or did anything provocative toward Appellant. [1CH375] As best Dr. Gollaher could tell, Appellant's acts were "completely unprovoked." [1CH375]

- Dr. Gollaher agreed that sometimes people with bipolar disorder feel in the manic state as Appellant indicates--sustained periods of feeling all-powerful and nothing can prevent him from doing what he chooses to do. [1CH376-77] If Appellant's feeling is due to a manic state, medications will help. [1CH377] But if Appellant is referring instead to a mindset, medications will not help. [1CH377] Dr. Gollaher's psychological testing did not support a diagnosis of bipolar disorder. [1CH368]

- Appellant's psychological test showed a primary diagnosis of conduct disorder, the precursor to antisocial personality disorder present in a youth under 18, and Dr. Gollahar believed that Appellant was on the path to a diagnosis of antisocial behavior. [1CH323, 368]

When all of the evidence is considered, the juvenile court's finding "[t]hat the public cannot be protected if DAMION GENTRY remains in the juvenile system and that the likelihood that the juvenile system could rehabilitate DAMION GENTRY is

25

very remote" is ***not*** so against the great weight and preponderance of the evidence as to be clearly wrong or unjust.

> 5. *The record substantiates the juvenile court's specific factual findings, and the court did not abuse its discretion in certifying Appellant.*

When all the evidence adduced at the certification hearing is considered, none of the juvenile court's findings are so against the great weight and preponderance of the evidence as to be clearly wrong or unjust. Further, the trial court's findings as set forth above are also substantially more case-specific than the findings analyzed in *Moon*, where the trial court's findings only considered that the offense was against another person. *Moon*, 410 S.W.3d at 372 ("The only reason specifically stated on the face of the transfer order to justify waiver of juvenile jurisdiction is that the offense alleged is a serious one."). *Compare,* the findings in *Gonzales v. State*, 2015 WL 2124773, at *5, *with* the juvenile court's findings in this case. No abuse of discretion in certifying Appellant to stand trial as an adult is shown.

Point of Error One should be overruled.

## Appellant's Point of Error Two

The trial court committed reversible error and abused its discretion in denying appellant's motion to suppress his written statement. [Br at 2, 24]

## State's Answer

Appellant's written statement was not the product of an audio recording and was taken in accordance with law.

## Argument

In his second issue, Appellant asserts that the trial court erred in admitting his written statement because the audio recording was suppressed and the written statement that was "taken simultaneously during the recording of the audio statement . . . was the fruit of the tainted oral, audio confession and should be likewise inadmissible. *Wong Sun* v. U.S., 371 U.S.471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1962)." [Br at 24, 27]

While Appellant strives mightily to frame his argument as a Constitutional issue, it is not. The trial court did not find that Appellant's statements were involuntary. [2SH25-26] During arguments to the trial court, Appellant conceded that the suppression of the audio recording and oral statements to the detectives was based on state statutes--Section 51.095, Family Code and Articles 38.22 and 38.23, Code of Criminal Procedure--because the warnings had not been recorded. [2SH4, 5, 6]

27

*A. Standard of Review*

When reviewing a trial court's ruling on a motion to suppress, we apply an abuse of discretion standard of review, giving almost total deference to the trial court's determination of the historical facts that the record supports, and a de novo standard for the legal components of the trial court's decision. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). When the trial court makes no explicit findings of historical facts, we view the evidence in the light most favorable to the trial court's ruling. *Carmouche*, 10 S.W.3d at 327–28. If the trial court's ruling is correct under any theory of law applicable to the case, the ruling will be sustained. *State v. Ross*, 32 S.W.3d 853, 855–56 (Tex. Crim. App. 2000).

Section 51.095 governs the admissibility of a juvenile's custodial statement. *See* Tex. Family Code Ann. § 51.095. A child's written statement is admissible if, among other requirements, "the statement shows that the child has at some time before the making of the statement received" the requisite warning from a magistrate. *See id.* §51.095(a)(1)(A).

*Delapaz v. State*, No. 05-11-01465-CR, 2013 WL 1896187, at *1-*2 (Tex. App.--Dallas May 6, 2013, pet. ref'd) (not designated for publication).

A statement taken in accordance with Section 51.095 is admissible in evidence. *Jeffley v. State*, 38 S.W.3d 847, 858 (Tex. App.--Houston [14th Dist.] 2001, pet. ref'd). "Therefore, the trial court did not err in denying appellant's motion to suppress the statement." *Id.*

The *Delapaz* court succinctly summarized the circumstances in *Jeffley*:

In *Jeffrey*[8] *v. State*, Jeffrey, a juvenile, was interviewed at a police station about a murder. 38 S.W.3d 847, 852 (Tex. App.--Houston [14th Dist.] 2001, pet. ref'd). Jeffrey gave one written statement and four oral statements before receiving warnings pursuant to section 51.095. *Id.* In her fourth oral statement, Jeffrey incriminated herself. *Id.* After she made the incriminating statement, a magistrate administered the warnings prescribed by section 51.095. Jeffrey then provided a second written statement. *Id.* After making the second written statement, another magistrate issued a second set of warnings. *Id.* The court of appeals concluded that Jeffrey's third and fourth oral custodial statements were inadmissible because they were obtained without a magistrate's warning in violation of section 51.095. *Id.* at 858. However, the court also concluded that Jeffrey's second written statement, also the result of a custodial interrogation, was obtained in accordance with section 51.095 because Jeffrey received the required warning before providing the statement. *Id.* The court of appeals concluded the trial court did not err by denying Jeffrey's motion to suppress the second written statement. *Id.*

*Delapaz*, 2013 WL 1896187, at *2.

B.      *Appellant's written statement was taken in accordance with Section 51.095, and no abuse of discretion in admitting the statement is shown.*

Appellant was in custody when he was taken to Judge Ward for his magistrate's warnings and interviewed. [1SH35] The audio recording of Appellant's oral statements was suppressed because the recording itself did not comply with a state statute governing the admissibility of an audio recording of a juvenile's custodial oral statements, i.e., that such a recording must include the magistrate's

---

[8]      Should be "Jeffley." *Jeffly v. State*, 38 S.W.3d 847 (Tex. App.--Houston [14th Dist.] 2001, pet ref'd).

29

warning and the child's waiver of each right before the statement. Tex. Fam. Code § 51.095(a)(5)(A) (West 2012). In this case, Judge Ward had lawfully administered the statutory warnings, but those were not recorded. [1SH8-14, 40] Therefore, the audio recording was not admissible and was suppressed by the trial court. [2SH25]

Likewise, testimony about Appellant's custodial oral statements during his interview with detectives was not admissible under state statutes governing the admissibility of those oral statements, i.e., that custodial oral statements are not admissible unless recorded. Tex. Fam. Code § 51.095(a)(5) & (d) (West 2012). Since the audio recording of Appellant's statements was not made in accordance with Section 51.095, the recording and testimony about the Appellant's custodial oral statements were not admissible and were suppressed by the trial court. [2SH25]

Appellant's written statement, however, was taken strictly by the book.

Subsection 51.095(a)(1) provides that "the statement of a child is admissible in evidence in any future proceeding concerning the matter about which the statement was given if the statement is made in writing [while a child is in custody of an officer] and:

> (A) the statement shows that the child has at some time before the making of the statement received from a magistrate a warning that:
>
> (i) the child may remain silent and not make any statement at all and that any statement that the child makes may be used in evidence against the child;

30

(ii) the child has the right to have an attorney present to advise the child either prior to any questioning or during the questioning;

(iii) if the child is unable to employ an attorney, the child has the right to have an attorney appointed to counsel with the child before or during any interviews with peace officers or attorneys representing the state; and

(iv) the child has the right to terminate the interview at any time;

(B) and:

(i) the statement must be signed in the presence of a magistrate by the child with no law enforcement officer or prosecuting attorney present, except that a magistrate may require a bailiff or a law enforcement officer if a bailiff is not available to be present if the magistrate determines that the presence of the bailiff or law enforcement officer is necessary for the personal safety of the magistrate or other court personnel, provided that the bailiff or law enforcement officer may not carry a weapon in the presence of the child; and

(ii) the magistrate must be fully convinced that the child understands the nature and contents of the statement and that the child is signing the same voluntarily, and if a statement is taken, the magistrate must sign a written statement verifying the foregoing requisites have been met;

(C) the child knowingly, intelligently, and voluntarily waives these rights before and during the making of the statement and signs the statement in the presence of a magistrate; and

(D) the magistrate certifies that the magistrate has examined the child independent of any law enforcement officer or prosecuting attorney, except as required to ensure the personal safety of the magistrate or other court personnel, and has determined that the child understands the nature and contents of the statement and has knowingly, intelligently, and voluntarily waived these rights.

Tex. Fam. Code § 51.095(a)(1) (West 2012).

Here, Judge Ward testified that she was authorized by the county to administer magistrate warnings to juveniles suspected of crimes. [1SH7] Judge Ward testified that she met and talked with Appellant in her office, which "is directly across from a conference room and the police officers were in the conference room." [1SH10] These areas are designated by the Juvenile Board of Fort Bend County as a juvenile processing location. [1SH18-19] Appellant was in the custody of the police, but was not handcuffed and could leave her office at any time. [1SH11]

Judge Ward testified that she had no reason to ask Appellant whether he had been drinking or about any drug activity because "I observed his attitude and the way he was to me and it was very pleasant so I had no reason to question otherwise." [1SH9] Judge Ward testified that she conversed with Appellant in English, and Appellant appeared to have no difficulty in communicating with her. [1SH21] Judge Ward believed that Appellant was okay to proceed. [1SH9]

Judge Ward testified that she used a juvenile statement form that conformed to the requirements of Section 51.095, Texas Family Code, containing the "magistrate juvenile warning," the juvenile statement form, and "the magistrate juvenile verification." [1SH15-16, 14RRState's Ex 25] Judge Ward began the warning process at 9:35 a.m. [1SH17] Judge Ward admonished Appellant that he was being charged with Aggravated Robbery, a first degree offense, and that it was a serious

32

offense.  [1SH 19]

Judge Ward testified that she gave Appellant the four required warnings, checking off each as she read it, and having Appellant initial each to indicate he understood.  [1SH20-21]  Judge Ward testified, "After I gave him his magistrate warning, I advised him that if he wished to talked [sic] to the police officers, he could do so." [1SH11-12]  Appellant indicated that he would like to talk to them and went to the conference room at about 9:42 a.m.  [1SH12, 25]  Judge Ward remained in her office working and heard no raised disturbances or raised voices from the conference room.  [1SH12, 24-25]

Appellant talked with the officers, then was brought back to Judge Ward's office.  [1SH13]  "I asked him if that was his statement, yes, and that he gave that statement voluntary [sic] and he said he did." [1SH14] Judge Ward testified that she read Appellant his statement, they talked for a few minutes, and Appellant signed the statement. [1SH26] Judge Ward testified that Appellant had no changes, corrections, alterations, or deletions to the statement as read to him.  [1SH26]  Judge Ward drew "x's" through several blank spaces and asked Appellant to initial them, "so no one else could add or take away." [1SH26]  After reviewing Appellant's statement with him, Judge Ward signed and noted the time as 11:55 a.m.  [1SH25-26]

The trial court found that the written statement complied with Family Code, Section 51.095, and "specifically that the defendant prior to and during the making

33

of the written statement knowingly, intelligently and voluntarily waived the rights set out in the warning prescribed by Subsection A of Section 2 of Article 38.22 . . . And those are the warnings also contained on the document itself." [2SH26]

Appellant's written statement was taken in compliance with Section 51.095, and therefore, the trial court did not abuse its discretion in denying Appellant's motion to suppress and admitting the statement. Point of Error Two should be overruled.

### Appellant's Point of Error Three

The evidence is insufficient to support Appellant's conviction for aggravated robbery in cause number 12-DCR-61921. [Br at 2, 31]

### State's Answer

Any rational trier of fact could find beyond a reasonable doubt the element of Appellant's intent to commit theft in approaching Mr. Garza's vehicle with a gun.

### Argument and Authorities

In his third point of error, Appellant asserts that the evidence is insufficient to prove Appellant's intent to commit robbery because "there was no dialogue" between Appellant and the victim, Masario Garza, and Mr. Garza "assumed that this person was going to rob him." [Br at 33-34] Appellant argues, "The jury was put in a position to speculate and guess at what Appellant's conduct and intent was." [Br at

34]

Appellant forgets Mr. Garza's testimony that when he saw Appellant approach his vehicle with a gun, "I thought, you know, this is no good here because he's going to try to ***rob*** me or something, you know. I wasn't going to wait around and see what he was going to do." [6RR18, emphasis added] Appellant also forgets that his trial included evidence that about a half hour after shooting Mr. Garza, Appellant approached Mr. Escobar while he was hard at work cleaning up a store parking lot and demanded $150 at gunpoint. [5RR7, 18, 21] That Appellant was in the course of committing theft, and Appellant's intent to obtain property from Mr. Garza could be reasonably inferred from his demand for money from Mr. Escobar under similar circumstances. *See* Tex. R. Evid. 404(b).

### A. Standard of Review

> The inquiry on review of the legal sufficiency of the evidence to support a criminal conviction is whether, after viewing the evidence in a light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Ross v. State*, 133 S.W.3d 618, 620 (Tex. Crim. App. 2004). The same standard of review applies to cases involving direct or circumstantial evidence. *Burden v. State*, 55 S.W.3d 608, 613 (Tex. Crim. App. 2001).

*Powell v. State*, 194 S.W.3d 503, 506 (Tex. Crim. App. 2006).

> In a circumstantial-evidence case, it is unnecessary for every fact to point directly and independently to the guilt of the accused; rather, it is enough if the finding of guilt is warranted by the cumulative force of all

the incriminating evidence. *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993). Similarly, a reviewing court is permitted to consider all evidence in the trial-court record, whether admissible or inadmissible, when making a legal-sufficiency determination. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999).

*Powell*, 194 S.W.3d at 507.

A person commits aggravated robbery, a first degree felony, if in the course of committing theft and with intent to obtain or maintain control of property he intentionally or knowingly threatens or places another in fear of imminent bodily injury or death and the person uses or exhibits a deadly weapon or the victim is 65 years of age or older. Tex. Pen. Code §§ 29.02(a)(2); 29.03(a)(2) & (3)(A) (West 2012). A person commits theft if the person appropriates property with intent to deprive the owner of property without the owner's effective consent. Tex. Pen. Code §§ 29.02(a), 31.03(a) (West 2012). "'In the course of committing theft' means conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft." Tex. Pen. Code § 29.01(1) (West 2012).

The indictment tracked the statutes and included two paragraphs: (1) for use of a deadly weapon, and (2) for the victim, Masario Garza, being a person 65 years of age or older. [CR-336 at 12]

The application paragraph of the jury charge tracked the indictment and gave the jury the option to find Appellant not guilty of aggravated robbery, but guilty of

36

aggravated assault:

> Now, bearing in mind the foregoing instructions, if you find from the evidence beyond a reasonable doubt that on or about January 19, 2012, in Fort Bend County, Texas, the Defendant, Damion Gentry, acting alone or as a party, did then and there while in the course of committing theft of property and with intent to obtain or maintain control of the property, intentionally or knowingly threaten or place Marsario Garza in fear of imminent bodily injury or death, and you also find that said Defendant did then and there use or exhibit a deadly weapon, to wit: a firearm, OR that Marsario Garza is a person sixty-five years of age or older, you will find the Defendant "Guilty" of Aggravated Robbery as charged in the indictment.

> Unless you so find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant and say by your verdict "not Guilty," and you will next consider the lesser-included offense of Aggravated Assault.

[CR-336 at 315]

> B.     *The finding of guilt in the robbery of Marsario Garza is warranted by the cumulative force of all the incriminating evidence.*

Mr. Garza testified that when he saw the gun, he thought he was going to get robbed, stepped on the gas, and took off. [6RR18] Mr. Garza "wasn't going to wait around and see what [Appellant] was going to do." [6RR18]

Again, "'[i]n the course of committing theft' means conduct that occurs in an attempt to commit, during the of commission, or in immediate flight after the attempt or commission of theft." Tex. Pen. Code § 29.01(1).

The prosecutor correctly argued, "Does our law say you should wait around to

37

be robbed and then only you can be changed [sic] with aggravated robbery?  No, it doesn't . . . The very first definition under roman numeral I, it quotes, "in the course of committing theft." Means conduct that was engaged in during an attempt, an attempt to commit, . . . So an attempt to commit is enough. . . . You don't have to wait around to get robbed."  [8RR11-12]

Further, Appellant's intent to commit theft is shown by his similar act of getting out of the passenger side of the truck, approaching Mr. Escobar with a gun, and demanding $150 just a half an hour later.  [5RR18]  Any reasonable juror could draw an inference from Appellant's frustrated effort to obtain money in robbing Mr. Garza, who was driving his car and sped off, that Appellant would pick on a person, who was on foot and could not speed off.  And any reasonable juror could draw an inference that the shooting at Mr. Garza on Highway 90 was linked to the shooting at Mr. Escobar in Rosenberg, and that both aggravated robberies were committed in the same criminal transaction to thieve.

When all the evidence is considered, "the finding of guilt is warranted by the cumulative force of all the incriminating evidence." *Powell*, 194 S.W.3d at 507.  Any rational trier of fact could find beyond a reasonable doubt that Appellant was in the course of committing theft when he approached sixty-eight-year-old Marsario Garza.

Point of Error Three should be overruled.

## PRAYER

The State prays that the judgment of the trial court be affirmed.

John Healey, Jr.
SBOT # 09328300
District Attorney, 268th Judicial District
Fort Bend County, Texas

/s/ Gail Kikawa McConnell
Gail Kikawa McConnell
Assistant District Attorney
SBOT # 11395400
Fort Bend County, Texas
301 Jackson Street, Room 101
Richmond, Texas 77469
(281) 341-4460 / (281) 238-3340 (fax)
Gail.McConnell@fortbendcountytx.gov

## CERTIFICATE OF COMPLIANCE

I hereby certify that the State's Appellate Brief, in total through the prayer, contains 11,056 words as counted by WordPerfect 6X, which is less than the 15,000 word limit for a brief.

/s/ Gail Kikawa McConnell
Gail Kikawa McConnell

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the State's appellate brief was served by e-mail or the case filing manager on July 10, 2015, on Mr. Michael Diaz, Attorney for Appellant.

/s/ Gail Kikawa McConnell
Gail Kikawa McConnell